STATE EX REL. HAIRE, RELATOR, *v.* RICE, AS STATE TREAS-
URER, RESPONDENT.

(No. 2,258.)

(Submitted December 20, 1905.   Decided January 8, 1906.)

*State Normal School—School Lands—Bonds—Constitution—
Enabling Act—Statutory Construction—Communis Error
Facit Jus.*

Normal School Lands—Bond Issues—Constitutionality.
   1.   Chapter 3 of Session Laws of 1905 (page 3), authorizing the state
   board of land commissioners to issue and sell bonds, the proceeds to
   be applied to the erection, furnishing and equipment of an addition
   to the state normal school building, and pledging as security, for the
   payment of the principal and interest on such bonds the lands granted
   by section 17 of the Enabling Act (25 Statutes at Large, 676), is void
   because in violation of section 12, Article XI, of the Constitution of

Montana, which provides that the funds of the state institutions of learning, from whatever source secured, shall be invested and only the interest from such funds, together with the rents from leased lands belonging to the normal school grant, devoted to the maintenance of such school.

Constitution—Enabling Act—Construction—Conflict.

2. The supreme court in construing provisions of the state Constitution and of the Enabling Act, under which the former was adopted and the state admitted into the Union, will, in response to a contention that where the Constitution is in conflict with the Enabling Act the former must yield, reconcile, if possible, the provisions of both instruments, since courts will with the greatest hesitation hold inoperative and invalid a provision of the state Constitution.

State Normal School Lands—Enabling Act—Constitution—Conflict.

3. *Held*, that section 17 of the Enabling Act (25 Statutes at Large, 676), which grants certain lands to the state of Montana for the state normal school and provides for the manner in which such lands shall be held and disposed of and the funds derived therefrom applied, and section 12 of Article XI of the Constitution of the state, under which the legislature may prescribe the manner in which the funds shall be loaned, are not in conflict.

Constitution—Contemporaneous Construction.

4. The doctrine of contemporaneous construction only becomes effective when there is a reasonable doubt as to the meaning of the provision to be construed, and acquiescence for no length of time in a construction by co-ordinate branches of the government, which has the effect of nullifying a provision of the Constitution, will justify the courts in adopting such construction unless it is the only reasonable one.

Enabling Act—Construction—*Communis Error Facit Jus.*

5. *Held*, that the construction given to section 17 of the Enabling Act (relating to grants of land to the state normal school and their disposition) by the legislature of Montana, as evinced by legislative authorization of bond issues against the various land grants, has not been so uniform or made under such circumstances as to render applicable the maxim, "*Communis error facit jus.*"

State Normal School—Enabling Act—Construction.

6. *Semble.* It would seem that the early assemblies of the state legislature understood that the Congress in the Enabling Act (25 Statutes at Large, 676), relative to grants of land for state normal school purposes, meant that the state should, in the first instance, erect the necessary buildings for such institution out of its own funds, and that the grant made in section 17 of that Act should constitute an endowment for the maintenance and perpetuation of such school.

· ORIGINAL application for writ of mandate by the state on the relation of Charles S. Haire, relator, against James H. Rice, as state treasurer, to compel the payment of a warrant against the State Normal School Fund. Dismissed.

*Messrs. Carpenter, Day & Carpenter,* for Relator.

The provisions of chapter 3, Laws of 1905, are not prohibited by, but are in compliance with, section 17 of the Enabling Act.

The word "establishment" as used in said section 17 means the erection and equipment of buildings from the proceeds of the grants for the purpose of the establishment and maintenance of the institutions sought to be established and maintained. It would be absurd to contend that by "establishment" is meant the simple location of the school of mines, or an Act of the legislative assembly declaring that a school of mines is established and located at a particular place. It would not require one hundred thousand acres or one acre for the legislative assembly to do this, and Congress never intended to make an extensive land grant for that simple formality. What Congress clearly intended was to grant one hundred thousand acres to Montana for the purpose of erecting school of mines buildings, and afterward using the unexpended proceeds and the income in maintaining the institution. The last sentence of section 17 is as follows: "And the lands granted by this section shall be held appropriated and disposed of exclusively for the purposes herein mentioned, and in such manner as the legislatures of the respective states may severally provide."

In arriving at the true meaning of this sentence there should be no mistake as to the legal signification of the different words composing it. "Shall be held," means that the state shall have the legal title to the lands to be selected as in the act provided. To "appropriate," does not mean to select or claim the lands, but to apply the proceeds or income from the lands to fulfill the trust, i. e., to apply such proceeds or income to the establishment and maintenance of the institutions. To "appropriate" in all of the Enabling Acts means to apply to the use or purpose for which the grant was made. To "appropriate" is held by judicial authority to allot, assign or apply in any way to a person or thing for a particular purpose. (*Woodward* v. *Reynolds,* 58 Conn. 486, 19 Atl. 511; *State* v. *Bordelon,* 6 La. Ann. 68, 69; *State* v. *Sioux City etc. Ry. Co.,* 7 Neb. 357, 373; *State* v. *Derham,* 61 S. C. 358, 39 S. E. 379; *Hoyt* v. *Story,* 3 Barb. 262, 264.)

There is no restriction as to the disposal of the lands if the purpose (for the establishment and maintenance) is observed. They may be rented, mortgaged or sold. The proceeds may be immediately utilized or they may be pledged, or loaned at interest, and the income used for the purposes mentioned. The granted lands are to be appropriated and disposed of in such manner as the legislature may provide. "In such manner" does not limit the preceding words to mere matters of form. The phrase includes mode, method or way, and the means and instrumentalities by which a thing is to be done. (*Northrop* v. *Curtis,* 5 Conn. 246, 253; *Fifth Avenue Bank* v. *Colgate,* 54 N. Y. Super. Ct. (22 Jones & S.) 188, 196; *In re Monk,* 16 Utah, 100, 50 Pac. 810, 811; *City of Erie* v. *Caulkins,* 85 Pa. St. 253, 27 Am. Rep. 646.)

Congress has always manifested a particular solicitude for the common schools. In all land grants to the states, the first are for the support of such schools. When grants of land for other purposes have been made, Congress has generally regarded the state legislature as the proper atuhority, in its own way, to appropriate and dispose of the lands for the purposes named, without any restriction, except in special cases, with confidence that the legislature would properly execute the trust. The provisions of sections 11 and 17 are inconsistent with each other, and the provisions of section 17 are to be treated as an exception to the broad language of section 11. The stated purpose of said section is to dispose of all lands granted for (so-called) educational purposes, at public sale, at not less than ten dollars per acre, the proceeds to constitute a permanent school fund, of which the interest only shall be expended for the support of said schools. The purpose of section 17 is to leave to the legislature the disposal in its own way of the lands therein granted—the legislature to apply the proceeds and the income thereof to the establishment and maintenance of certain institutions, without further restriction. By section 11, only the income of lands granted for (so-called) educational pur- poses is to be appropriated to the support of schools. By sec-

tion 17 the lands granted are to be appropriated to the establishment and maintenance of the institutions therein named. By section 11 all the lands granted for educational purposes are to be disposed of in the manner therein provided. By section 17 the lands granted for the institutions therein named are to be disposed of in whatsoever way the legislature may deem best. By section 11 one permanent school fund is provided for. By section 17 a fund for each institution is contemplated, and also by that section the same method of appropriation and disposal applies to lands granted for the institutions of learning therein named, as to lands granted for public buildings at the capital.

Two propositions, then, seem to be firmly established: 1. That all lands granted for "educational purposes," as these quoted words are used in section 11, do not include lands granted by section 17, and that the word "schools" as used in section 11 means common schools. 2. If the words "all lands granted for educational purposes," as used in section 11, when construed in connection with the remainder, can be held, if said section stood alone, to include the lands specially granted for educational purposes by section 17, the special provisions of section 17 must be taken to constitute an exception to the general provisions of section 11.

It is unnecessary to cite authorities to the effect that the legislature of a state is supreme except where its powers are plainly limited by the Constitution of the United States, or of the state, or, in this case, by the Enabling Act, the terms and conditions of which were accepted by the people in a duly authorized convention. Whether there was an unwise disposition of the funds is not a question for the courts. (*People* v. *Mayor of Brooklyn,* 4 N. Y. 432; *Spencer* v. *Merchant,* 125 U. S. 353, 355, 8 Sup. Ct. 921, 31 L. Ed. 766.) "A restriction upon the legislature in respect of a matter which is properly the subject of legislation will not be implied, but must be clearly expressed." (*People* v. *New York Cent. R. R. Co.,* 24 N. Y. 497; *People* v. *New York Cent. R. R. Co.,* 34 Barb. 138, 139.)

The Acts providing for the issuance of bonds to aid in the establishment of the various institutions have been similar to chapter 3 for ten years. The often repeated legislative construction has been that these Acts are in no respect in violation of the Enabling Act, or the Montana Constitution, and this construction is entitled to great weight. (*State* v. *Wright,* 17 Mont. 77, 42 Pac. 103; *State* v. *Collins,* 21 Mont. 451, 53 Pac. 1114; *State* v. *Barrett,* 26 Mont. 62, 66 Pac. 504.) Courts adhere to a rule once decided and acquiesced in, and where money has been invested in reliance upon it, the rule will not be disturbed. (*Wetmore* v. *Parker,* 52 N. Y. 457; *Leggett* v. *Hyde,* 58 N. Y. 277, 17 Am. Rep. 244.)

The scheme of the Enabling Act in regard to donations for common schools and the higher institutions of learning is that as to the common schools only the interest of the permanent school fund shall be used for their support, and nothing for buildings, but as to the higher institutions the legislature should be left with a free hand to appropriate the money for their establishment and maintenance as it thought best. Chapter 3 is not repugnant to any part of the Enabling Act, or to any part of Article XI of the state Constitution. In fact, said chapter 3 does not present a case of investing or diversion at all. It is simply a case of borrowing money through state agencies to establish the normal school, and pledging the proceeds and income of the land grant for repayment of the loan without recourse to the state, as the legislature was clearly authorized by section 17 of the Enabling Act to do, and it is difficult to see how any consideration of the provisions of section 12 of Article XI is called for or becomes in any way material in this case.

*Mr. M. S. Gunn,* and *Mr. W. T. Pigott,* for Relator.

To what lands does section 11 of the Enabling Act apply? The grant contained in section 10 of that Act is a grant *in praesenti.* When the states were admitted into the Union the title to sections 16 and 36 passed, whether the same were sur-

veyed or unsurveyed. (*Schulenburg* v. *Harriman,* 21 Wall. 44, 21 L. Ed. 551; *Beecher* v. *Weatherby,* 95 U. S. 517, 24 L. Ed. 440; *Sherman* v. *Buick,* 45 Cal. 656; *Daggett* v. *Bonewitz,* 7 N. E. 900.) Section 17 of the above Act contains a grant of lands "in quantity," and by virtue of the provisions of section 19, the title to such lands could not pass until after there had been a selection, and such selection could not be made until after the lands had been surveyed, and could then be made from such lands only as had not been reserved or appropriated. (*McNee* v. *Donahue,* 142 U. S. 587, 12 Sup. Ct. 211, 35 L. Ed. 1122; *Patterson* v. *Tatum,* 3 Saw. 164, Fed. Cas. No. 10,830; *Terry* v. *Megerle,* 24 Cal. 619, 85 Am. Dec. 84.) We have, then, a grant by section 10 of specific lands, the title to which passed to the states upon their admission into the Union, whether such lands at that time were surveyed or unsurveyed. On the other hand, section 17 did not grant the title to any particular lands, but merely vested the right to a specific quantity to be afterward selected. In view of these considerations, we are irresistibly forced to the conclusion that the lands referred to in section 11 are the specific lands granted by section 10. Any other construction would lead to absurd results. As the lands granted in section 17 are granted in quantity, there could be no reservation of these lands except by reserving all of the public lands in the states mentioned in the Act. Congress could not have intended such a reservation.. (*Foley* v. *Harrison,* 15 How. 444, 14 L. Ed. 766.) The only construction of section 11 that is reasonable and in harmony with section 19 is that the lands referred to therein are the lands granted by section 10. Section 11 necessarily relates to a specific grant, whereas section 19 expressly declares that the lands therein referred to are the lands granted "in quantity" and "as indemnity."

Does the Enabling Act or the state Constitution control? The grant contained in section 17 of the Enabling Act must be construed both as a law and as a contract. (*McGehee* v. *Mathis,* 4 Wall. 143, 18 L. Ed. 314; *Missouri R. & T. Ry. Co.* v.

*Kansas Pac. Ry. Co.,* 97 U. S. 491, 24 L. Ed. 1095; *Schulenberg*
v. *Harriman,* 21 Wall. 44, 21 L. Ed. 551.)    By the Constitution
of the United States there is granted to Congress all the powers
therein enumerated.    To the extent of this grant the people
have divested themselves of the attributes of sovereignty.    A
law is but the expression of the will of the sovereign power.
It is impossible, therefore, for any law of a state, whether found
in the Constitution or in a statute, to conflict with the Con-
stitution of the United States or any Act of Congress made in
pursuance thereof.    If a provision of a Constitution or a stat-
ute of a state is inconsistent with the Constitution of the United
States or an Act of Congress, it is not law.    (U. S. Const.,
Art. VI.)    The grants contained in the Enabling Act were
made pursuant to Constitution, Article IV, section 3.    These
grants are laws, and if section 12 of Article XI of the
Constitution of Montana is inconsistent therewith, it must yield
to the Act of Congress making said grants, which is the su-
preme law of the land.    (*Poindexter* v. *Greenhow,* 114 U. S.
270, 5 Sup. Ct. 903, 962, 29 L. Ed. 185.)

When Congress, by section 17 of the Enabling Act, provided
that the lands granted by that section should be held, appro-
priated and disposed of in such manner as the legislatures
of the respective states should severally provide, it created the
legislatures of the several states the agents to carry out and
perform the trust which was imposed upon the states by the
grant made.    By virtue of the authority thus conferred upon
the legislature it was beyond the power of the people of the
state, in the Constitution, to control in any manner the legis-
lature with reference to the holding, appropriation and dis-
posal of such lands.

Having considered the grant as a law, we shall now view it
as a contract.    When considered as a contract, if section 12
of Article XI of the Constitution of Montana is inconsistent
therewith, then such section is within the prohibition of section
10 of Article I of the Constitution of the United States which
declares that "no state shall   *   *   *   pass any   *   *   *   law

impairing the obligation of contracts." (*Gunn* v. *Barry*, 15
Wall. 610, 21 L. Ed. 212; *McGehee* v. *Mathis*, 4 Wall. 143, 18
L. Ed. 314.) By section 7 of Ordinance No. 1, relating to fed-
eral relations, the constitutional convention accepted of the
grants made by the Enabling Act "upon the terms and con-
ditions therein provided." This acceptance created the con-
tract. It follows that if section 12 of Article XI of the Con-
stitution which did not become operative until ratified at the
election held on the first Tuesday of October, 1889, is incon-
sistent with the contract resulting from the acceptance of the
grants made by section 17 of the Enabling Act, such section is
a nullity by virtue of the contract clause of the Constitution
of the United States. If section 12 of Article XI changes the
terms of the contract by imposing new conditions or dispens-
ing with those expressed or embodied, it impairs the obliga-
tion of that contract. (*State Savings Bank* v. *Barrett*, 25 Mont.
112.)

Does the Act pursuant to which the bonds were issued con-
travene section 12 of Article XI of the state Constitution?
When section 12 of Article XI is read in connection with the
Enabling Act, it clearly means that the funds provided for
by that Act, and which are specifically mentioned therein, and
any funds which might thereafter be created for either of the
other institutions of learning, shall be controlled thereby. It
was recognized that funds might be created otherwise than by
the sale of the lands granted by the Enabling Act, as refer-
ence is made to funds "from whatever source accruing." As
the grants made by the Enabling Act were "accepted upon the
terms and conditions therein provided," and in the preamble
to the Constitution it was declared to be the purpose of the
framers of the Constitution to "ordain and establish this Con-
stitution in accordance with the Enabling Act," it cannot be
supposed that it was the intention of section 12 of Article XI
that the proceeds derived from the sale of the lands granted
by section 17 should be treated and held as permanent funds
in direct violation of the provisions of the Enabling Act. Fur-

thermore, section 12 of Article XI speaks of funds "dedicated." This could not refer to the proceeds of the lands granted by section 17, as no fund is "dedicated," but the lands are "appropriated."

If, however, section 12 should be construed to mean that the proceeds realized from the sale of the lands granted by section 17 are to be regarded as the "funds" of the different institutions of learning mentioned therein, section 12 may still be construed to harmonize with our construction of the Enabling Act. The fact that the funds are used for the establishment and maintenance of the different institutions does not violate the constitutional command that the same should remain inviolate and sacred to the purposes for which they were dedicated. When used for the purposes contemplated by the Enabling Act, they still remain inviolate and sacred to such purposes. Section 12 does not say that all funds shall be invested, and when read in connection with the Enabling Act, it means that the funds which are not used for the establishment and maintenance of such institutions shall be invested, and the interest and income shall be used as therein provided.

If, however, the court should take the view that this section of the Constitution requires that the proceeds of the lands granted by section 17 of the Enabling Act for a state normal school are funds within the meaning of that term, as used in the Constitution, and that section 12 of Article XI requires all funds to be invested, then we respectfully submit that the same is in conflict with the Enabling Act, and that the Constitution of the United States and the laws enacted in pursuance thereof, are the supreme law of the land, and any provision of the Constitution which is in conflict with the Enabling Act must yield to the Enabling Act and be regarded as of no force or effect whatever.

We further submit that if there is any doubt as to the constitutionality of the Act of 1905, that doubt must be resolved in favor of the validity of the Act. (*Ogden* v. *Saunders,* 12 Wheat. 213, 6 L. Ed. 606; *People ex rel. Robertson* v. *Van Gas-*

*kin,* 5 Mont. 352, 6 Pac. 30; *State* v. *Kenney,* 10 Mont. 410, 25 Pac. 1022; *State* v. *Broadbent,* 27 Mont. 63, 69 Pac. 323.)

The bonds are payable out of the fund to be created as provided in section 4 of the Act, and the state shall not be held liable for the payment of either the principal or interest: It is impossible, therefore, for any of the funds realized from general taxation to be applied to the payment of said bonds. Under these circumstances no indebtedness is created against the state. (*State* v. *Cook,* 17 Mont. 529, 43 Pac. 928; *State* v. *Collins,* 21 Mont. 448, 53 Pac. 1114; *Atkinson* v. *City of Great Falls,* 16 Mont. 372, 40 Pac. 877.)

*Mr. Albert J. Galen,* Attorney General, *Mr. W. H. Poorman,* and *Mr. E. M. Hall,* Assistant Attorneys General, for Respondent.

It is apparent from the wording of section 11 of the Enabling Act that it is intended to be a clear and distinct limitation as to all grants of lands mentioned in the Enabling Act and made to the state for educational purposes. It is an independent section and is connected with the balance of the Act of which it is a part, only by the conditions, limitations and permission prescribed and given regarding the disposition of the various land grants mentioned in the Act itself. If this section relates only to the grants mentioned in section 10 of the Enabling Act, why was it necessary to make of it a separate and independent section? In section 10 the term "common schools" is used, while in section 11 the use of this term is studiously avoided and the term "permanent schools" and "school" are used. Why this switching of terms if only the one grant is meant? The "common school fund" is only a part of the "permanent school fund," for the latter includes all the permanent funds of the various educational institutions as will hereafter appear.

The language employed in section 11 is general. It does not limit the application of the section to any one grant, but makes it equally applicable to all the land grants. The word "herein" has a distinct and specific meaning. It is defined by

all lexicographers to mean "in this," substituting this acknowledged meaning of the word for the word itself, and the phrase will read "that all lands in this granted, etc." In this what granted? Not in this section 11, for no grant is made by that section. Certainly not "in this preceding section 10," nor "in this subsequent section 17," but "in this Act of Congress granted." "The words 'herein provided,' or 'not herein provided for,' as used in the United States statutes, generally, if not always, refer to the Act, Chapter or Title, and not to the section. Before the revision they referred to the Act or Chapter, but since, more generally, to the Title." (*May* v. *Simmons,* 4 Fed. 499. See, also, *State* v. *Glenn et al.,* 7 Heisk. (Tenn.) 472; *Arthurs' Exrs.* v. *Butterfield,* 125 U. S. 70, 8 Sup. Ct. 714, 31 L. Ed. 643; *Smythe* v. *Fiske,* 90 U. S. 374, 23 L. Ed. 47; *Movins* v. *Arthur,* 95 U. S. 144, 24 L. Ed. 420; *Iasigi* v. *Iasigi,* 161 Mass. 75, 36 N. E. 579; *Parker* v. *Iasigi,* 138 Mass. 416; *In re Pearsons' Estate,* 98 Cal. 603, 33 Pac. 451.)

Section 17 of the Enabling Act contains this provision: "And the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the various states may severally provide." But this section nowhere contains any direction as to the appropriation or disposition of the funds received from the sale of the lands granted, nor are such directions found anywhere in the Enabling Act except in sections 11 and 14. Unless, therefore, section 11 and the prohibitions and restrictions expressed in section 14 apply to section 17, the concluding clause of the latter section is entirely meaningless. (*State* v. *Maynard,* 31 Wash. 132, 71 Pac. 775; *State* v. *McMillan,* 12 N. Dak. 280, 96 N. W. 310; *Roach et al.* v. *Gooding et al.* (Idaho), 81 Pac. 642.)

Much stress is laid upon the words "establishment and maintenance" as used in that portion of section 17 of the Enabling Act which grants lands to Montana for educational purposes. It is claimed that such words, as there used, include the erection of buildings. While the words "establishment and main-

tenance" are not used in connection with the grant of lands for said normal schools, and from the punctuation used in said section 17, cannot by any rules of construction be read in as a part of such grant, however, what would be the effect upon such grant if such words were construed to apply thereto? The uniform policy of Congress in making grants of land for educational purposes has been to limit the use of the land so granted and the proceeds derived therefrom to the support and maintenance of such institutions, and to expressly provide that the same shall not be used to erect school buildings. Does section 17 of the Enabling Act by the use of the word "establishment," if that word is to be construed in connection with the normal school grant, change the unbroken policy of Congress heretofore followed in making such grants? None of the definitions of "established" or "establishment" by the Webster, Century and Bouvier dictionaries give such words a meaning synonymous with "build," "erect" or "construct." The words "establish" and "establishment" standing alone are never construed in the sense of "to construct" or "to erect" buildings. They are used in connection with incorporeal rather than corporeal things. (*Village of Brockfort* v. *Green,* 23 Misc. Rep. 231, 79 N. Y. Supp. 416. See, also, 16 Cyc. 591; 4 Words and Phrases, p. 3004.)

Section 11 clearly shows, beyond any question of doubt, that the lands granted to the state for educational purposes were intended as an endowment, and that the proceeds therefrom were to constitute a permanent endowment fund. Hence it is clear from the context of the Enabling Act that the phrase "for the establishment and maintenance of," as used in section 17, means "for the endowment and maintenance of." See Stroud's Judicial Dictionary, which in defining "establish" says: "Compare 'endow,' and in defining 'endow' says: "Compare 'establish.'" The authorities all hold that "maintenance" means the running or current expenses, and does not include the construction of buildings. (*Sheldon* v. *Purdy,* 17 Wash. 135, 49 Pac. 230; *Mitchell* v. *Colgin,* 122 Cal. 296, 54 Pac. 905; *Roach*

v. *Gooding* (Idaho), 81 Pac. 644.)   By construing the word "establishment" to mean "endowment," it is then in harmony with the context of the entire Enabling Act, and is also in harmony with the theretofore unbroken policy of Congress in making grants of land to states for educational institutions.

The construction placed by the constitutional convention of Montana upon all the grants of land in the Enabling Act for educational purposes was that they constitute an endowment for the support, maintenance and perpetuation of such institutions.   Sections 2, 3 and 12 of Article XI of the state Constitution clearly show that the constitutional convention never intended that the proceeds received from such grants should ever be pledged or used for the purposes of erecting school buildings.   In fact such sections of the Constitution expressly prohibit such use of the funds.   Section 8 of the Enabling Act provides that in the formation of the state Constitution all provisions of the Enabling Act must be complied with, and that, upon such compliance, the President must issue his proclamation admitting the state into the Union.   The fact that our Constitution was approved and the state admitted shows conclusively that the construction of the Enabling Act adopted by the framers of our Constitution was the construction thereof intended by Congress.   Congress certainly expected and intended that the legislature would enact laws not in conflict with the state Constitution which had been adopted in conformity with the provisions of the Enabling Act and approved by Congress through the President.

Is Chapter 3, Laws of 1905, providing for additional buildings and equipment for the state normal college, in conflict with our Constitution?   Does it violate the plain provision of section 3 and section 12 of Article XI?   If it does, it is unconstitutional, regardless of the provisions of the Enabling Act. If the Constitution throws around the funds in question additional safeguards and limitations, which are not repugnant to those contained in the Enabling Act, they control and must not be violated.   Section 2 of Article XI of the Constitution

defines the "public school fund of the state." This fund consists not only of proceeds from the sale of sections 16 and 36 granted for the support of the "common schools," but also of the proceeds from the sale of lands granted for the maintenance of the various educational institutions of the state. Each of these educational institutions is a part of the public school system of the state, as well as the common or district schools. (See *Roach* v. *Gooding, supra.*) The public school fund shall "remain inviolate." "The word 'inviolate' is defined by approved lexicographers to mean 'unhurt, uninjured, unpolluted, unbroken.'" (4 Words and Phrases, 3759; *Flint River Steamboat Co.* v. *Roberts,* 2 Fla. 114, 48 Am. Dec. 178.) Would the taking of money out of said public school fund and using it to erect school buildings leave the fund "unhurt; uninjured; unbroken; untouched"? That it would not, is self-evident—especially when we consider that buildings must necessarily crumble and decay; that the ravages of time and the elements will within the period of a few generations totally destroy the value of such buildings.

If the fund created from the sale of these lands is to forever remain inviolate, the same to be invested and only the interest and rents to be used, and this use limited to the maintenance and perpetuation of the institutions—certainly all the elements of an endowment fund are contained therein. All the safeguards for the protection of an endowment fund are there set out in unmistakable language. Any Act of the legislature to divert this fund, or to pledge or expend it in any manner, except in an investment which will produce interest and revenue and keep the fund permanent and inviolate, is absolutely unconstitutional; and any Act which authorizes the use of the interest received from the investment of such fund for any other purpose than the maintenance and perpetuation of the institution, is absolutely unconstitutional. The words "maintenance, perpetuation and support" of schools do not include the erection of buildings. (*Sheldon* v. *Purdy,* 17. Wash. 135, 49 Pac.

230; *Mitchell* v. *Colgin,* 122 Cal. 296, 54 Pac. 905; *Roach* v. *Gooding* (Idaho), 81 Pac. 644.)

Chapter 3, Laws of 1905, which attempts to divert these funds by pledging them for the payment of bonds issued for the purpose of securing money to erect school buildings, is in direct violation of all the provisions of section 12 and also of section 3 of Article XI, and therefore unconstitutional, and all bonds issued in pursuance thereof are invalid.

The normal school is a state institution; it is not a corporation; it has no legal entity and cannot contract indebtedness except as authorized by the state. The state board of education is merely an agent of the state to execute the will and command of the state. When acting within the scope of its authority it binds its principal, the state. If the law giving it the authority is void, it does not bind the state, nor does it bind the institution, for the state and not the institution is the principal. Hence, any indebtedness created by this agent, if valid, is a state debt and not a debt against the institution, which has no legal entity and which is only a creation of the state, established and supported by the state (Article X, Const., sec. 1), and at all times under the absolute jurisdiction and control of the state. (Enabling Act, sec. 14.) Only the owners of property can mortgage it or charge it with debt. The state owns these lands as trustee. The title thereof vests in the state as trustee; the proceeds arising from the sales of the land belong to the state as trustee; the interest on such proceeds is state property in trust and the same is true of rents received from leases and moneys derived from the sales of timber growing on such land. In *State* v. *McMillan, supra,* it is held that the bonding of the lands granted for educational purposes, without first submitting the question to a vote of the people, was in violation of the state Constitution limiting the amount of the state's indebtedness. "It makes no difference whether the debt is contracted on the general credit of the state or on the credit of a fund belonging to the state." (*Rodman* v. *Munson,* 13 Barb. 63; *Newell* v. *People,* 7 N. Y. 9; *Joliet* v. *Alexander,* 194 Ill. 457, 62

N. E. 861; *State* v. *Mills,* 55 Wis. 229, 12 N. W. 359; *Sloan* v.
*State,* 51 Wis. 623, 8 N. W. 393; *Jewell Nursery Co.* v. *State,*
4 S. Dak. 213, 56 N. W. 113; *Weary* v. *State University,* 42 Iowa,
335; *State* v. *White,* 82 Ind. 278, 42 Am. Rep. 496; *Neil* v.
*Board,* 31 Ohio St. 15.)

The Act of 1905 provides that the state shall not be liable
for the payment of these bonds, but it does authorize the hy-
pothecation of a part of the property held in trust by the state
(the state normal school lands) to secure their payment. No-
where in the Constitution is the state authorized to act as surety,
or to permit its property to be hypothecated for that purpose.
It is either liable as principal or not liable at all. A debt can-
not exist without both a debtor and a creditor. The purchaser
of the bonds is the creditor. Who is the debtor? Surely not
the institution, for it has no legal entity and cannot contract a
debt. Not the fund derived from the sale of the land, for that
constitutes a permanent fund which must forever remain in-
tact and inviolate. It necessarily follows that "the bonds in
question are bonds of the state or bonds of no one." (See
*State* v. *McMillan,* 12 N. Dak. 280, 96 N. W. 310.)

And inasmuch as the Act by its terms provides that the state
is not liable, it follows that the bonds have no validity whatever.

It is contended by relator that the grants named in section
17 of the Enabling Act are not subject to the limitations ex-
pressed in section 11 of that Act, but are wholly at the will
of the state legislature with reference to the disposition of the
funds arising from the sale of the lands granted. A grant
of land to the state for the purpose named in the Act that
leaves the state the *sole* judge of when that purpose is accom-
plished is not a grant on condition. (*Mills County* v. *Railway
Cos.,* 107 U. S. 557, 27 L. Ed. 558; *United States* v. *Louisiana,*
127 U. S. 182, 8 Sup. Ct. 1047, 32 L. Ed. 66; *Cook Co.* v. *Cal-
umet etc. Canal Co.,* 138 U. S. 635, 11 Sup. Ct. 435, 34 L. Ed.
1110.) If, then, this grant is without condition, the state owns
these lands the same as though title had been obtained from
some other source. Being the owner of the fee simple without

condition or restriction, the state in the exercise of its sovereign authority can either by constitutional provision or legislative enactment, place a restriction upon the use of these funds. Section 12 of Article XI of the state Constitution contains that restriction.

Counsel for relator claims that section 11 of the Enabling Act, because of the use of the word "unsurveyed," was not intended to limit the grants made in section 17 of said Act, and therefore, of necessity, must limit only the grants made in section 10. There is no merit whatever in the contention that by the use of the word "unsurveyed" in section 11 it must be held to apply only to section 10 and not to other grants for educational purposes, for the reason that any argument advanced to show that it does not apply to grants in quantity may be urged with equal force to show that it does not apply to grants including indemnity lands, mentioned in section 10, prior to the survey of the land. If we hold that section 11 does not apply to either section 10 or 17 because of the word "unsurveyed" therein, then the whole of section 11 becomes a nullity and ceases to be a limitation upon any of the grants mentioned in the Enabling Act. But by giving to the word "unsurveyed" in section 11 the construction given to that word, as used in the Enabling Act of Nevada, by the United States supreme court in *Heydenfelt* v. *Daney Gold etc. Min. Co.*, 93 U. S. 634, 23 L. Ed. 995, the section would stand and be a limitation upon all grants for educational purposes after the lands had been surveyed and selected and the title of the state fully attached thereto. (See, also, *Mining Co.* v. *Consolidated Mining Co.*, 102 U. S. 167, 26 L. Ed. 126.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

The Ninth Legislative Assembly of Montana passed an Act entitled, "An Act to enable the Normal School Land Grant to be further utilized in providing Additional Buildings and Equipment for the Montana State Normal College," approved Febru-

ary 2, 1905. This Act authorizes the state board of land commissioners to issue bonds, sell the same, and apply the proceeds to the erection, furnishing, and equipment of an addition to the present State Normal School building at Dillon. It is provided that the funds realized from the sale or leasing of the lands granted by the United States to Montana for State Normal School purposes (100,000 acres), and the licenses received from permits to cut timber on any of said lands, are pledged as security for the payment of the principal and interest on such bonds, except such sums as may be necessary to pay other bonds heretofore issued. There is the further provision that the state of Montana shall not be liable for the payment of the bonds or the interest. Pursuant to the provisions of this Act, the state board of land commissioners issued coupon bonds to the amount of $75-000, dated May 1, 1905, in denominations of $1,000 each, bearing interest at four per cent per annum, payable semiannually, and caused the same to be executed as prescribed by such Act. Thereafter such bonds were duly advertised for sale by the state treasurer, and the state board of land commissioners submitted a bid for said bonds at par as an investment for the permanent common school fund, which bid was accepted, and, presumably, the money for the bonds paid over to the credit of the building fund of the Normal School, although this does not appear affirmatively from the petition filed herein.

This relator, having performed services in connection with the erection of the addition to the State Normal School building, presented a claim for $1,200 to the executive board of the State Normal School, which was allowed and approved by that board and allowed and ordered paid by the state board of examiners, a warrant issued for the same by the state auditor, and this warrant presented by the relator to the state treasurer, who refused to pay it. Thereupon this proceeding in *mandamus* was commenced to compel the state treasurer to pay said warrant. An alternative writ and an order to show cause issued, and upon the return the state treasurer, represented by the attorney general, moved to quash the alternative writ and dismiss the proceedings,

upon the ground that the petition for the writ does not state facts sufficient to entitle the relator to any relief.

The contention of the respondent is that the Act of the Legislative Assembly above referred to is unconstitutional, first, because the Act authorizes the expenditure of funds received from the sale of the Normal School lands for the payment of these bonds; second, because the issuance of said bonds increases the indebtedness against the state of Montana to an amount in excess of $100,000; and, third, because the Act authorizes the expenditure of the money for the erection of a building for the State Normal School.

By the provisions of section 17 of the Act of Congress, approved February 22, 1889 (25 Stats. at Large 676), commonly known as the "Enabling Act," there was granted to the state of Montana "For State Normal Schools" 100,000 acres of the public land. Other grants were made for the School of Mines, the Agricultural College, the State Reform School, the Deaf and Dumb Asylum, and the State Capitol buildings; and by other sections of the same Act a grant of seventy-two sections of the public land was made for a University, and grants, additional to those mentioned in section 17, for the State Capitol buildings and Agricultural College. Other like grants of land were made by the same Act to the states of North Dakota, South Dakota and Washington, and of the grants made by section 17 it is said: "And the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective states may severally provide."

Section 5 of the Act of February 2, 1905 (Laws 1905, p. 5), provides that the state treasurer shall keep all moneys derived from the sale, leases, or sale of timber from lands granted in aid of the State Normal School, in a separate fund to be known as the "State Normal School Fund," and out of this fund he shall pay the interest on these bonds as it accrues, and the principal at maturity.

Section 12 of Article XI of the Constitution of Montana provides: ''The funds of the State University and of all other state institutions of learning, from whatever source accruing, shall forever remain inviolate and sacred to the purpose for which they were dedicated. The various funds shall be respectively invested under such regulations as may be prescribed by law, and shall be guaranteed by the state against loss or diversion. The interest of said invested funds, together with the rents from leased lands or properties, shall be devoted to the maintenance and perpetuation of these respective institutions.''

Beyond question the State Normal School is one of the institutions of learning to which reference is here made, and, as it is the only one with which we are directly concerned in this proceeding, we may paraphrase section 12 above as follows: The funds of the State Normal School, from whatever source secured, shall be invested as prescribed by law, and the interest from such invested funds, together with the rents from leased lands belonging to the Normal School grant, shall be devoted to the maintenance of such Normal School. The provisions of this section of the Constitution are mandatory and prohibitory. (Sec. 27, Art. III.) *The funds* referred to mean *all* funds. They shall be invested *to draw interest,* and used for no other purpose. The interest from such invested funds, and the rents from lands belonging to this grant, which have not been sold—and not the principal sum derived from the sale of such lands or from the sale of timber—shall be used for the maintenance and perpetuation of the Normal School, and for no other purpose. If, then, the principal sum received from the sale of lands belonging to the Normal School grant must be invested to draw interest, that principal sum cannot be used to pay off the principal of or interest on the bonds authorized by the Act of February 2, 1905, as provided by such Act.

It is apparent from the most casual reading of section 12 of Article XI of the Constitution, and section 5 of the Act of February 2, 1905 (Laws 1905, p. 5), above, that as soon as the treasurer receives any moneys from the sale of Normal School lands

or timber therefrom into "The State Normal School Fund" such moneys shall be invested to draw interest, under such regulations as may be prescribed by law, and that only the interest on such invested funds, together with the rents from leased lands, can be devoted to the maintenance and perpetuation of the Normal School. If this section of the Constitution is to be given force and effect, it is apparent that the Act in diverting the moneys received from the sale of Normal School lands, or the sale of timber therefrom, to the payment of these bonds, is in direct violation of the provisions of this section of the Constitution.

But on behalf of the relator it is contended that by the terms of section 17 of the Enabling Act the lands granted to the state for Normal School purposes are to be held, appropriated, and disposed of for Normal School purposes in such manner as the legislature of Montana may provide, and that this Act is sufficiently broad to warrant the legislature in borrowing money and pledging such lands for the payment of the principal and interest. And it is further contended that, if section 12 of Article XI of the Constitution contravenes the provisions of section 17 of the Enabling Act, section 12 is invalid and of no force or effect. It is perfectly apparent, then, that, in order to hold the Act of the legislature approved February 2, 1905, binding and the bonds issued in pursuance thereof valid, this court must hold section 12 of Article XI of the Constitution inoperative and of no effect. However, as the Constitution of Montana is the supreme law of this state, aside from the provisions of the Constitution of the United States and the treaties made and statutes enacted in pursuance thereof, it becomes incumbent upon this court to reconcile, if possible, the provisions of our Constitution with the Enabling Act under which the Constitution was adopted and the state admitted into the Union; for, however reluctant a court is to declare unconstitutional and invalid an Act of a legislative assembly, it will with even greater hesitation hold inoperative and invalid a provision of a state Constitution.

It is to be observed that the lands granted to the state by the Enabling Act are granted for specific purposes which are clearly defined: 100,000 acres are granted for State Normal Schools, and the only limitation upon the grant is that such lands shall be held, appropriated, and disposed of exclusively for the purposes mentioned, in such manner as the legislature may provide. Under section 17 above the legislature might designate the agent to select and classify the lands. It might specify that the lands should be sold at private sale or at public auction. It might specify the quantity of land to be sold at any one time or the amount to be sold to any one individual. It might provide the terms upon which the land should be sold, and the price to be received for it. It might make suitable provision for renting the land, and fix the amount to be let to any one person and the price at which it should be let; and, finally, it might make provision for the sale of growing trees upon the lands selected under the terms of this grant. All of these provisions in section 17 were met by legislative enactments comprised in Title VIII, Part III, of the Political Code.

The question now arises: Does section 12 of Article XI of the Constitution contravene the provisions of section 17 of the Enabling Act? Is there any conflict between the provisions of the Enabling Act which grants to the state legislature authority to prescribe the manner in which these Normal School lands shall be held, appropriated, and disposed of, and the provisions of section 12 of Article XI of the Constitution, which provides that the funds of the State Normal School shall be invested, and only the interest from the invested funds, together with the rent from leased lands, may be used for the maintenance and perpetuation of the State Normal School? We are of the opinion that there is no conflict whatever. Under the provisions of section 17 of the Enabling Act the legislature has to do only with the *manner* of the management and disposition of the *lands* themselves, and cannot control the funds derived from sales or leases, except in conformity with the constitutional provisions of section 12 of Article XI above.

The lands were granted to the state of Montana, not to the Legislative Assembly. The legislature may say how the lands shall be held; but it is the state which holds them, which has title to them. It is the state which says what shall be done with the lands. The legislature may prescribe the manner of holding or disposing of them, but the title passes from the state, and the funds derived from sales or leases pass to the state, to be disposed of by the state as it may see fit, subject only to the condition that they shall be used exclusively for Normal School purposes. The state may act through its constitutional convention, and, if it does so, such action is conclusive. In the absence of constitutional provision, it may act through its legislative assembly. Therefore, when the Constitution says that all moneys coming into the State Normal School fund, from whatever source, shall be invested and only the interest and rental from leased lands shall be used for Normal School purposes, the legislature may prescribe the manner in which the funds shall be loaned, but it cannot say that they shall go into any other channel. The absence of any constitutional provision respecting the grant for Capitol Building purposes, and the grant of the Penitentiary at Deer Lodge City and the lands connected therewith, left the legislature free to make such disposition of these grants as it saw fit, so long as the original purpose of the respective grants was observed.

In the very highest sense the purpose of the grant in aid of the State Normal School is observed and carried into effect by section 12 of Article XI of the Constitution. In the wisdom of the framers of that instrument provision is made for the support of our State Normal School for all time. The principal sums derived from the sales of the lands or of timber are made to serve this institution by earning interest which may be applied to its maintenance and perpetuation, while the principal sums themselves are kept inviolate.

A great deal of consideration was given by counsel to the question whether or not the language of section 11 of the Enabling Act modifies the language of section 17; and, while we

are of the opinion that it does not do so, under our view of the case it is not necessary to give further attention to this feature of the case. Neither are we disposed to enter into a discussion now as to whether the bonds authorized by this Act increase the state debt.

So far as the other question is concerned, it need only be noticed in passing. The United States granted 100,000 acres of land to Montana "for State Normal Schools." The Congress was only concerned in seeing that this grant was applied to the purpose for which made. It was apparent that, in order to be available, the lands must be utilized, and the Congress therefore left it to the legislature of this state to designate the manner in which such lands should be held, appropriated, or disposed of; but it went no further than this. It did not attempt to say when the Normal School should be instituted, how many Normal Schools should be established, or how the funds derived from the sale or leasing of these lands should be controlled or made to work out most effectually the end sought by the grant.

The constitutional convention adopted Ordinance No. 1, whereby the grant of these lands was accepted upon the terms and conditions provided in the Act; and as an extra precaution and as an additional safeguard section 12 of Article XI of the Constitution was adopted, making the grant in fact an endowment, and only the interest and rental immediately available for the use of the school, and such interest and rental may be used for any legitimate purpose connected with the maintenance or perpetuation of the school.

But it is said that other like bond issues have been made against these various land grants, and that for a number of years the legislative and executive branches of this state government have given to section 17 of the Enabling Act the construction for which contention is now made by this relator, and that such construction ought to be given great weight by this court. But, as said before, such construction has the effect of nullifying a section of our state Constitution, and this court ought to be slow indeed to declare such a result, no matter if the legisla-

tive and executive branches of the state government may have done so. Furthermore, the rule that contemporaneous, construction by the department specially delegated to carry into effect a particular provision of law shall raise a strong presumption that such construction rightly interprets the provision, only becomes effective when there is a reasonable doubt as to the meaning of the provision. Such construction can never abrogate the text or fritter away its obvious sense. And acquiescence for no length of time in a construction by the co-ordinate branches of government which has the effect of nullifying a provision of the Constitution will justify a court in adopting such construction unless it is the only reasonable one. (Cooley's Constitutional Limitations, 7th ed., 104-106.) Furthermore, such construction, to be available as an argument, must have been uniform, and such is not the fact with reference to the subject now under consideration.

The Enabling Act was passed February 22, 1889, and it is not contended that any attempt was ever made by the legislative or executive departments of the state government to give to section 17 the construction now claimed for it by relator prior to March 6, 1895, when the first of these bond issues was authorized (Political Code, sections 1630-1637), so that the construction thereafter given by the legislature was not in fact contemporaneous with the passage of the Act. But, on the other hand, the constitutional convention met in July, 1889, and adopted section 12 of Article XI as the expression of its interpretation of section 17 of the Enabling Act and the Second Legislative Assembly passed an Act entitled "An Act to Provide for the Selection, Location, Appraisal, Sale, and Leasing of State Lands," approved March 6, 1891 (Laws 1891, p. 174a), by the terms of which it is specifically provided that all moneys derived from the sale of these lands shall be invested, and only the interest of such invested funds and rental from leased lands shall be used for the purpose for which the grant was made. These provisions were re-enacted in an act of the Third Legislative Assembly, approved March 9, 1893 (Session Laws, 1893, p.

49), and again re-enacted in a Code provision (section 3509,
Political Code) approved February 25, 1895. Thus, within five
months after the Enabling Act was passed, we have a construc-
tion of section 17 of it, by the constitutional convention, di-
rectly opposed to the view now urged by relator, and we further
have apparently the same construction placed upon it, or at
least an attempt to carry into effect the idea of the framers of
the Constitution, by every session of the legislature, barring the
first—which did not accomplish anything in the way of legis-
lation—from the time of the passage of the Enabling Act to
March 6, 1895; and it does not affect the result to say that the
various institutions had not been established prior to 1893.

It would seem that the early sessions of our legislature under-
stood that the Congress meant that the state of Montana should
in the first instance build the necessary buildings for a State
Normal School out of its own proper funds, and that this bounty
should constitute an endowment for the maintenance and per-
petuation of such school for all time to come thereafter; and
that this was the construction given to section 17 of the Enab-
ling Act by our legislative assembly is demonstrated by the ac-
tion taken by it at the time these several state institutions were
established. The Third Legislative Assembly provided for the es-
tablishment and location of the Agricultural College, the Uni-
versity, the Normal School, and School of Mines, and made an
appropriation for each of these institutions. That for the State
Normal School is similar to the others, and provides for an ap-
propriation of $15,000, and respecting this appropriation the
Act says: ''The money hereby appropriated shall be expended
under the direction of the state board of education, in the man-
ner and under such restrictions as may be provided by law,
and for the purpose of establishing said State Normal School,
by commencing the construction of suitable buildings for main-
tenance of said State Normal School.'' It was clearly the un-
derstanding of the legislative assembly at that time that the
state itself must erect the buildings, and it provided for the com-
mencement of such work evidently with the idea that future

legislatures would make other appropriations to complete the work then initiated. So that the construction given to section 17 of the Enabling Act by the Montana legislature has not been uniform, even if the terms of that section were of doubtful meaning, which does not appear to be the fact. We do not think that the construction given to that section since 1895 has been done under such circumstances, or that the result to be anticipated from a different construction now by the courts is of such character as to render applicable here the maxim, "*Communis error facit jus.*"

While we do not agree with the reasoning of the supreme courts of Washington and North Dakota respecting the meaning of section 11 of the Enabling Act, it is interesting to note that they have held legislation of the character of the Act of February 2, 1905, invalid, and bond issues similar to that authorized by our legislature void, and that, too, under the same Enabling Act and somewhat similar constitutional provisions. (*State ex rel. Heuston* v. *Maynard,* 31 Wash. 132, 71 Pac. 775; *State ex rel. Board* v. *McMillan,* 12 N. Dak. 280, 96 N. W. 310.) The Act of the legislature now under consideration in authorizing the expenditure of moneys received from the sale of Normal School lands, or the timber on lands granted in aid of the State Normal School, for the payment of these bonds or the interest accruing thereon, is in direct violation of the provisions of section 12, Article XI, of the State Constitution, and is therefore void and of no effect; and, being so, the state treasurer rightly refused to proceed under it and cannot be coerced by *mandamus.*

The alternative writ of *mandamus* is quashed and these proceedings are dismissed.

*Dismissed.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE MILBURN: I concur in the order and in the opinion. I think it is well, however, inasmuch as a great deal is said in the opinion, and very properly, in regard to contemporaneous construction, that the statements made in the body of the bonds

themselves in respect of the validity thereof should appear. Sec- tion 3470 of the Political Code declares that the governor, the superintendent of public instruction, the Secretary of State, and the attorney general shall constitute the state board of land com- missioners. As appears from an inspection of the bonds, these officers signed each of said bonds. In each bond appears the fol- lowing statement: "It is hereby recited and certified that this bond is issued in strict compliance with and conformity to * * * the Constitution and laws of the state of Montana, and that all acts, conditions and things required and necessary to be done precedent to the issuance of this bond, and in the execution thereof, have been duly, properly, regularly and le- gally done, had and performed, and the full faith and diligence of the state board of land commissioners are hereby irrevocably pledged for the faithful collection and application of said funds for the payment of this bond and the interest thereon as herein and in said Act provided." As shown in the opinion, the bonds are not in compliance with the Constitution. I think it proper that this construction of the law by the several executive officers of the state, who are the present incumbents of the said offices and who signed the bonds, given at the time of the issuance of the bonds, should appear as part of the history of the case.

That part of section 17 of the Enabling Act saying that "the lands granted * * * shall be held, appropriated, and dis- posed of exclusively for the purpose herein mentioned, in such manner as the legislatures of the respective states may severally provide," means, in my opinion, in a few words, this: That the legislature may say *how* the lands may be sold, but does not mean that they shall say what shall be done with the proceeds. The Constitution, in my opinion, is controlling in the matter, and is not in violation of any of the provisions of the Enabling Act.

Rehearing denied February 27, 1906.

Appeal taken to supreme court of the United States.