*129 JUSTICE NELSON
dissents.
¶70 I dissent from our decision. I would hold that the commingling of school trust distributable revenues with the Generad Fund is a per se breach of the State’s fiduciary duties under the Montana Constitution and the Enabling Act. I would also hold that the “scheme”-and I do not use that term lightly-enacted as a result of SB 495 is a violation of the State’s duties to preserve the school trust as required by the Montana Constitution and the Enabling Act. I would, accordingly, reverse.
¶71 We discussed at length the State’s school trust responsibilities under our Constitution and under the Enabling Act in Montrust I, ¶¶ 13-17. I am not going to repeat that analysis here. I do note, however, that in its gloss-over of the responsibilities and duties we articulated in that decision, the Court has lowered the bar significantly as far as the State’s school trust trustee obligations are concerned. It is, indeed, shocking that this Court now approves the commingling of school trust distributable revenues with the General Fund with a “no harm, no foul” wink of the eye. It is equally indefensible that the Court justifies a “scheme” which robs Peter (future generations of school children) to pay Paul (present day school children) and holds that scheme is constitutional.

‘No Harm, No Foul”

¶72 It is undisputed that distributable revenue from the school trust was commingled in the General Fund. In justifying this practice, the Court takes the simplistic position that as long as the schools Eire distributed more from the General Fund than the interest income Eind bonuses put into the Fund, then the schools can prove no financiEd damage-^no harm, no foul.” The Court’s analysis misses the mark completely.
¶73 The fallacy in its approach is that the Court chooses to hold the State, in its capacity as a trustee of the school trust, to a lower standard than is enunciated in Montana’s trust law. As we stated in Montrust I, ¶ 14, the State is in fact a trustee of the school trust. Here, the State has failed to demonstrate that it is not bound by the same strict fiduciary obligations, duties and responsibilities that bind all trustees under Montana law. Nonetheless, the Court, without citing legal authority, concludes that this State’s trust law fades into insignificance when the State of Montana takes on the mantle of trustee.
¶74 Moreover, the Court’s analysis rings hollow. The Court frames Issue One as a question of whether the State has breached its duties. *130 However, the Court then proceeds to essentially consider the mere issue of whether harm has occurred. The trouble with this approach, of course, is that the issue of whether harm has occurred does not settle the questions regarding the legal duties at issue here. In other words, a violation of a legal duty is not stripped of all legal import or rendered nonexistent simply because, arguably, no harm has occurred consequent to that violation.
¶75 One of the most fundamental duties of a trustee is to keep clear and precise records to the end that the trustee is able to render routine, accurate accountings to the beneficiaries of the trust-here, Montana’s schools and school children. Sections 72-34-124 to -126, MCA.
¶76 In specific contravention to the State’s commingling of school trust distributable revenues and the General Fund, § 72-34-110, MCA, mandates:
The trustee has a duty to do the following:
(1) to keep the trust property separate from other property not subject to the trust; and
(2) to see that the trust property is designated as property of the trust.
¶77 This statutory requirement is echoed by the treatises and by the commentators. The Restatement (Second) of Trusts provides:
The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust, and to see that the property is designated as property of the trust.
Restatement (Second) of Trusts §179 (1959). Moreover, as is required by the blackletter law of Montana, the trustee
must render an accounting when called on to do so at reasonable times by the beneficiaries. Where there are several beneficiaries, any one of them can compel an accounting by the trustee.
William F. Fratcher, Scott on Trusts § 172 (4th ed. 1987). Likewise, Professor Bogert states that the trustee
‘Is bound to keep clear and accurate accounts, and if he does not the presumptions are all against him, obscurities and doubts being resolved adversely to him.”
George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 962 (rev. 2d ed. 1983) (citation omitted) (hereinafter Bogert on Trusts).
¶78 Clearly, these statutes which are applicable to all Montana *131 trastees, as well as these secondary authorities, forbid commingling of trust revenues with non-trust funds. The trustee must segregate trust and non-trust revenues and property, and must be able to precisely account between the two.
¶79 Yet, in the case sub judice, the Court gives the State, acting through the Board of Land Commissioners, a legal bye. The State, in its school trust trustee capacity, does not have to segregate trust distributable revenues from General Fund funds; the State does not have to see that the trust income is designated as property of the trust; the State does not have to keep clear accounts of trust versus non-trust income; nor does the State have to render to the trust beneficiaries accurate accountings of trust versus non-trust income.
¶80 Indeed, here, the trial judge had to concede that the State could not fulfill these most basic fiduciary obligations. As the trial judge stated, “[njone of the witnesses who testified at trial knew where the trust’s income has been or presently is deposited.”Having reached that damning conclusion, the court then went on to the analysis upon which this Court seizes:
However, the evidence established that the legislative appropriation to the schools has far exceeded any interest earned from the trust corpus. MonTRUST has failed to prove financial harm to the beneficiaries of the school trust on this basis.
‘No harm, no foul.”
¶81 There are some very practical reasons for the rule against commingling. First, a trustee which commingles its property with that of the trust may be tempted to use trust property as its own for non-trust purposes. Second, where-as here-money cannot be tracked, beneficiaries are frustrated in their attempts to police trust management. Consequently, those who would take advantage of the beneficiary and the commingled funds are in a better position to do so. Third, when trust funds are commingled, there is an increased risk that revenues and assets properly belonging to the trust will be improperly alienated to third parties.[5]
¶82 In the case at bar, the trial court, and now this Court, have abrogated the State’s obligation to accurately segregate and account for school trust distributable revenues and have, thus, subjected these *132 revenues to the harms mentioned above.
¶83 Commingling is a per se breach of the State’s statutory fiduciary obligations as the school trust trustee. Section 72-34-110, MCA. I can not agree with the Court’s ‘ho harm, no foul” analysis. It is absolutely contrary to Montana trust law. Accordingly, I dissent as to Issue One and would reverse.

Rob Peter to Pay Paul

¶84 Similarly, I dissent as to Issue Two.
I have some good news and some bad news. The good news is that the people who wrote and adopted our Enabling Act and our Constitution wisely established an inviolate trust fund to help defray the cost of the free quality public education that Montana’s children are guaranteed. The bad news is that the 2001 Legislature concocted a scheme to siphon off money from the trust and now it’s over $94 million short.
State Superintendent of Public Instruction, State of Education Address to the 2031 Legislature.
¶85 Despite the Court’s attempt to put the best spin possible on SB 495, the uncontroverted evidence is that on June 30, 2031, the trust corpus will have increased to $51,158,382, under the 2001 law, whereas under pre-2001 law the trust corpus would have increased to $145,854,146-a net loss to the trust corpus of $94,695,764.
¶86 The SB 495 scheme-simplified-was to authorize the Department of Natural Resources and Conservation, on behalf of the distributable trust fund, to “purchase” future “mineral production rights”-i.e., royalties-from the permanent fund. The purchase was funded by, what turned out to be, a $46,366,904 loan from the Coal Trust Fund. The mineral royalties so “purchased” would be used to service the loan and would be distributed to the school trust fund. No customary documents for the sale of mineral rights or transfer of leases were executed. Rather, the Land Board conveyed a “cumulative revenue stream” of mineral royalties equal to $138,894,596.
¶87 The Legislature was not advised in the fiscal note to SB 495 that Board of Investments estimates revealed that after fiscal year 2012 schools would get less trust income each year as a result of SB 495; that over the term of the deal, school revenues would be some $13.5 million less than before SB 495; and that, as already noted, the permanent trust corpus would be depleted permanently by over $94.6 million.
¶88 Why exactly this is such a great deal for the school trust escapes *133 any rational explanation. It does allow the Legislature the rob Peter (future school children) to pay Paul (present school children), thereby decreasing the Legislature’s obligation to adequately fund education currently under Article X, Section 1(3), of the Montana Constitution. But this short-sighted shell game does nothing for future generations of Montana’s school children.
¶89 More to the point, while this sort of financial chicanery may have been acceptable in the heady days of Enron-style accounting, it is unacceptable for the State as the trustee of the ‘Inviolate” school trust described in Article X, Section 3 of the Montana Constitution. Specifically, this constitutional provision requires that “[t]he public school fund shall forever remain inviolate, guaranteed by the state against loss or diversion.” This unambiguous requirement that the public school fund forever remain ‘Inviolate” means that it must forever remain ‘free from violation;”it must ‘hot [be] broken, infringed or impaired.”Black’s Law Dictionary 846 (8th ed. 2004). Allowing the trust fund to be dissipated by over $94.6 million in a thirty year period clearly violates the inviolability mandate of our Constitution. How much more impairment is the legislature willing to authorize and this Court willing to approve?
¶90 SB 495 also violates the Enabling Act. Minerals are part of the land-fhey are a real property interest. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 473, 898 P.2d 680, 688. Income from the extraction of minerals-i.e., royalties-represent an income interest. Stanford v. Rosebud County (1991), 251 Mont. 128, 136, 822 P.2d 1074, 1079; Stokes v. Tutvet (1958), 134 Mont. 250, 257, 328 P.2d 1096, 1100. This income becomes part of the trust “corpus” of the land trust, as Section 11 of the Enabling Act provides that
the proceeds from the sale and other permanent disposition of any of the said [school trust] lands and from every part thereof, shall constitute permanent funds for the support and maintenance of the public schools and the various state institutions for which the lands have been granted.
¶91 The “stream of mineral royalties”is purely and simply the income, or “proceeds,” from the future sale of trust minerals. As already noted, once minerals are extracted, that portion of the trust corpus formerly comprised by the mineral, or “real” estate, is replaced by a non-real or ‘Income” interest. Royalties are principal under a land trust. That income interest belongs to and becomes part of the trust corpus. However, under SB 495, the trust corpus is permanently dissipated by over $94.6 million by 2031. And this leads to the next violation of the *134 State’s fiduciary duties as the school trust trustee.
¶92 Besides refraining from commingling trust and non-trust income, another fundamental fiduciary obligation of a trustee under Montana law is the duty to preserve the corpus of the trust. Again, the blackletter trust law of Montana provides:
The trustee has a duty to take reasonable steps under the circumstances to take and keep control of and to preserve the trust property.
Section 72-34-107, MCA (emphasis added). See also Bogert on Trusts §582; Restatement (Second) of Trusts §176 (1959).
¶93 In the management of a trust, it is a breach of the trustee’s fiduciary obligations to favor present beneficiaries over future beneficiaries by dissipating the trust corpus. See State ex rel. Haire v. Rice (1906), 33 Mont. 365, 385-86, 83 P. 874, 876; Restatement (Second) of Trusts § 233 (1959). Yet, this is exactly what SB 495 mandates-the permanent dissipation of the school trust corpus over a period of thirty years by in excess of $94.6 million. Future generations of Montana school children deserve better management of their trust from their trustee. Future generations deserve the benefit of the full trust corpus-not a depleted one.
¶94 In short, under the blackletter law and under secondary authorities, this failure to preserve the school trust corpus is also a per se breach of the State’s fiduciary obligations and duties as the school trust trustee.
¶95 As it did in resolving Issue One, the Court, in putting its stamp of approval on the SB 495 scheme, abrogates yet another fundamental duty of the State as the school trust trustee-the duty to preserve the trust corpus. I can not agree, and again, I would reverse.
¶96 In summary, holding the State as the school trust trustee to a “no harm, no foul” standard in its commingling of distributable trust revenues and the General Fund, and allowing the trustee to rob Peter to pay Paul by dissipating the school trust corpus, is shocking. That the Legislature enacted legislation that is violative of the Enabling Act and our Constitution is bad enough; that our court system has upheld it, is inexcusable.
¶97 And the public wonders why the funding of our educational system is in such a mess!
¶98 I dissent.
JUSTICE COTTER joins in the dissent of JUSTICE NELSON.

 Professor Bogert cites these reasons in his discussion of the rule requiring trustees to “earmark” trust property. See Bogert on Trusts § 596. However, these reasons are applicable as well to the rule against commingling, which Bogert also discusses at §596.