STATE ex Rel. BOARD OF COUNTY COMMISSIONERS
OF VALLEY COUNTY, Relator, v. BRUCE, County
Assessor, et al., Respondents; VORNHOLT et al., In-
terveners.

(No. 7,682.)
(Submitted April 6, 1937.   Decided May 6, 1937.)
[69 Pac. (2d) 97.]

*Messrs. Booth & Booth,* for Relator, submitted an original and a supplemental brief and argued the cause orally.

*Mr. Thomas Dignan,* County Attorney of Valley County; *Mr. Otis A. Hallett,* Assistant County Attorney; *Mr. Harrison J. Freebourn,* Attorney General, and *Mr. E. K. Matson,* Assistant Attorney General, for Respondents, submitted an original and a supplemental brief; *Messrs. Hallett* and *Matson* argued the cause orally.

*Mr. John M. Kline* and *Mr. C. H. Roberts,* for Interveners P. C. Vornholt, Rexall Drug Store, Inc., F. A. Buttrey Co., Lou Lucke Co., Great Falls Meat Market et al., submitted an

original and a supplemental brief; *Mr. Kline* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an original proceeding brought by the relator, the Board of County Commissioners of Valley County, as such, seeking a writ of mandate against the county assessor and the county treasurer of that county, commanding them to levy and collect taxes in accordance with the statutes of the state upon the personal property belonging to persons and private corporations located within the townsite of Fort Peck.

The respondents appeared by motion to quash the alternative writ of mandate issued out of this court, and also without waiver of their motion filed answer to relator's petition. Certain persons, whose property would be the subject of taxation if the relief sought is granted, have, by leave of court first granted, filed a complaint in intervention. There are no material issues of fact raised by the various pleadings, although many issues are raised as to conclusions of law attempted to be drawn in the pleadings; hence we may state the facts as disclosed by the pleadings without reference to their particular source.

The United States government commenced the building of a dam across the Missouri River between Valley and McCone counties, in the month of October, 1933. The construction of the dam has continued since that date to the present time, and will not be completed for several years. The Secretary of War, with the approval of the Chief Engineer of the United States, began the construction of the dam under the Act of Congress of June 16, 1933, 48 Stat. 200, now sections 401 and 414, inclusive, U. S. C. A., Title 40, known as the "National Industrial Recovery Act," and continued under this enactment until June 7, 1935. Thereafter the construction was continued under the Emergency Relief Act of April 8, 1935 (Public Resolution No. 11, 74th Congress, 49 Stat. 115, 15 U. S. C. A., sec. 728, note), until May, 1936, from which date the construction of the dam

continued under the Maintenance and Improvement of Rivers and Harbors Act of Congress, of May 15, 1936, 49 Stat. 1306. The reservoir back of the dam, when filled after its completion, will cover lands in Valley, McCone, Garfield, Phillips, Petroleum, and Fergus counties. The dam is being constructed for the improvement of navigation of the Missouri River and for flood control.

The townsite of Fort Peck is in Valley county. In the fall of 1933 the United States, by purchase from the then owners, acquired various tracts of land included within and located in the vicinity of the site of the dam. On lands thus acquired, the United States about December 1, 1933, commenced the laying out of the town of Fort Peck. At its expense it constructed streets, alleys, sidewalks, waterworks, sewers, and buildings for administrative, school, and residential purposes, and for other services proper and convenient for the inhabitants of the town. Buildings were erected for stores and the usual mercantile pursuits, many of them by the United States. All of the lands in the townsite are owned by the United States. Some buildings have been erected on the townsite by individuals or private corporations for the use of the occupants, with the consent and approval of the federal government. The town is not incorporated; it is governed by a town manager who is an officer of the United States Army Corps of Engineers, and a subordinate of the District Engineer under the United States Army Chief Engineer. Fire and police protection is provided by the United States. Water supply, garbage disposal, and sanitation are maintained by the same. School facilities are provided by the Fort Peck Recreational Association. Law violators are prosecuted in the United States District Court of Montana. No elections are held in the town and no registration of electors is conducted there.

Persons desiring to engage in business within the town can do so only with the consent of the United States. They enter into what amounts to a lease which cannot be assigned, and no rights thereunder pass to a trustee in bankruptcy. They can only sell such merchandise as the government permits, and at

prices which are controlled and dictated by the designated authority of the government of the United States. It may be said that, as to these persons or private corporations, their every movement in their business activity is subject to the control and direction of the proper governmental officers.

It is the purpose of this proceeding to secure the levy and imposition of taxes on the personal property of the residents of this town. The town was built and is maintained to furnish a place of residence for administrative officials and others employed in and about the construction of the dam, which is near by. The occupants of the buildings and property pay a rental for the ground upon which their buildings are located and a license for conducting their business. The United States collects a share of the expense of installing and maintaining the streets, alleys, waterworks, sewage disposal, police and fire protection, and other services exclusively maintained by the United States on the townsite.

On October 10, 1934, the Acting Secretary of War by letter then notified the then Acting Governor of this state that the lands indicated on a map inclosed therewith, including the site of the dam, construction, town, tunnels, and spillways, were in the possession of the United States under agreement with the owners, and that the United States assumed "complete and exclusive jurisdiction" over these lands. The Acting Governor acknowledged the receipt of this communication and the inclosed map, and stated in reply that he would file the map with the "proper state authority and advise the officials of the state of the action taken by the federal government." Mention was made that this was in accordance with the provisions of Chapter 50, Laws of the Extraordinary Session of 1933–34, now section 25.1, Revised Codes.

On April 21, 1936, the Attorney General rendered an opinion to the county attorney of Valley county, holding that the property of persons and private corporations on the lands over which the federal government had assumed exclusive jurisdiction was not taxable by the several counties in which such property was

located. The respondents, relying on this opinion, declined to attempt to assess and collect taxes on this property.

Chapter 50, supra, was approved by the Governor on January 17, 1934. By its terms it reserved the right in the state and its political subdivisions to tax persons and private corporations, their franchises and property. This Act was one of cession by the state to the federal government of the lands on which the dam was located and under a body of water located back of the dam, and also the land touching such body of water.

It is the contention of the relator board, in general, that, although the federal government is exercising exclusive jurisdiction over the lands in question, by this Act of cession the right to tax the personal property of individuals and private corporations being expressly reserved to the state or its political subdivisions, it may tax such property.

The respondents and interveners contend that these lands were purchased by the United States with the consent of the state found in section 24, Revised Codes, that the purchase was made before the enactment of Chapter 50, supra, and that therefore it is without application as to lands purchased before its passage and approval, and, hence, that personal property on the lands is within the exclusive jurisdiction of the United States and not subject to state taxes.

Relator argues that section 24 was amended by section 25, which was the controlling Act of cession at the time of the purchase, the conditions of which have not been performed, and, until performed, the Act of cession is not operative, and therefore the consent of the state was never given to the purchase until the enactment of Chapter 50, supra, which after its enactment superseded section 25 so far as the Fort Peck area is concerned.

Article I, section 8, clause 17, of the federal Constitution provides: ''The Congress shall have power— * * * To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the

seat of government of the United States; and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.''

The various Acts of cession to which we have referred, supra, read as follows:

''24. The legislative assembly consents to the purchase or condemnation by the United States of any tract of land within this state for the purpose of erecting forts, magazines, arsenals, court-houses, postoffices, and other needful buildings, upon the express condition that all civil process issued from the courts of this state, and such criminal process as may issue under the authority of this state, against any person charged with crime, may be served and executed thereon in the same mode and manner, and by the same officers, as if the purchase or condemnation had not been made.''

''25. Pursuant to Article I, section 8, paragraph 17, of the Constitution of the United States, consent to purchase is hereby given, and exclusive jurisdiction ceded, to the United States over and with respect to any lands within the limits of this state, which shall be acquired by the United States, for any of the purposes described in said paragraph of the Constitution of the United States, said jurisdiction to continue as long as the said lands are held and occupied by the United States for public purposes; reserving, however, to this state a concurrent jurisdiction for the execution upon said lands of all process, civil or criminal, lawfully issued by the courts of the state, and not incompatible with the cession hereby made; provided, that an accurate map or plat and description by metes and bounds of said land shall be filed in the office of the county clerk and recorder of the county in which the same are situated, and if such lands shall be within the corporate limits of any city, such map or plat shall also be filed in the office of the city clerk of said city; and provided, further, that the state reserves the right to

tax all property of any railroad or other corporation having a right of way or location over or upon the said land.''

''25.1. That consent to purchase or condemn all necessary lands is hereby given and concurrent jurisdiction shall be, and the same is hereby, ceded to the United States over the Fort Peck dam, the body of water or artificial lake created by such dam, the land under such body of water, and any lands now owned or which may be hereafter acquired by the United States and which shall touch such body of water, all such being situated in the counties of Valley, Phillips, McCone, Garfield, Petroleum and Fergus, State of Montana, saving, however, to the said state the right to serve civil or criminal process within the limits of the territory over which jurisdiction is so ceded in any suits or prosecutions for or on account of rights obtained, obligations incurred, or crimes committed in said state, within or without said territory, and saving further to the said state the right to tax persons and corporations, their franchises and property within said territory, and reserving further to the said state and its inhabitants, citizens, and non-residents the right to fish or hunt by boat or otherwise, and the right of access, ingress and egress to and through said ceded territory to all persons owning or controlling livestock for the purpose of watering the same, and saving further to the state jurisdiction in the enforcement of the state laws relating to the duties of the live stock sanitary board, and the state board of health, and the enforcement of regulations promulgated by said boards in accordance with the laws of said state; provided, however, that jurisdiction shall not vest until the United States, through the proper officers, notifies the governor of the state of Montana that they assume police or military jurisdiction over said territory.''

An investigation of the history of these three sections reveals that section 25 was enacted in 1893; section 24 in 1895 as a part and parcel of our Code of 1895; and section 25.1 in 1934. The latter section was enacted subsequent to the time the United States acquired possession of the lands in question under agreement with the then owners, title to which was secured and purchase price paid. Title to none of these lands was acquired

by. condemnation, nor were any of these lands a part of the public domain. Both sections 24 and 25 are found in our Code of 1895 as published (Pol. Code 1895, secs. 42, 43), and they likewise are included in all subsequent revisions of our laws thereafter made. Therefore, it may become of importance to determine which of these sections prevails in the event it is determined that there is conflict between their provisions.

At the Fourth Session of the Legislative Assembly, at which ██ ██ the Codes of 1895 were adopted, a bill was enacted commonly known as the "omnibus bill," which declared in part (sec. 5182, Pol. Code of 1895): "The said four Codes * * * together with the Acts of the Third and Fourth Sessions of the Legislative Assembly shall constitute the public statutes of Montana." Sections 5183 and 5184, Political Code of 1895, both being a part of the same omnibus bill, read as follows: "That all Acts and parts of Acts enumerated in this Act are, and the same are hereby declared to be, parts of the Political Code; the Civil Code; the Code of Civil Procedure, and the Penal Code, respectively; and the commissioner appointed to codify and compile the said Codes is hereby authorized and directed to place and arrange the said Acts and parts of Acts in their proper places in the said Codes." (Sec. 5183.) "If any of the Acts or parts of Acts herein enumerated are in conflict with, or are inconsistent with, any of the provisions of the said Codes enumerated in Section 1, of this Act, or any of them, the Acts or parts of Acts herein enumerated are to be considered and construed as amendments to the respective Code or Codes, whose provisions they are in conflict with, or are inconsistent with, it being intended hereby that all of the Acts or parts of Acts herein enumerated shall be the law of the State of Montana, upon all respective subjects, so far as they are inconsistent with the provisions of the said Codes, or any of them, except as herein provided." (Sec. 5184.)

The effect of this so-called omnibus bill was many times before this court, and it has been consistently held that the provisions of the Acts of the third and fourth sessions, which were in con-

flict with the provisions of the Codes of 1895, as adopted by the legislature, prevailed as against the provisions of the Code of 1895, although previously enacted. (*State* v. *Bradshaw,* 53 Mont. 96, 161 Pac. 710; *King* v. *Pony Gold Min. Co.,* 24 Mont. 470, 62 Pac. 783, 786; *Steele* v. *Gilpatrick,* 18 Mont. 453, 45 Pac. 1089, 1090.) Hence, if there is any conflict between section 24 and section 25, supra, the provisions of the latter must prevail and the Act of cession which was in force prior to the enactment of Chapter 50, supra, was section 24, as amended by section 25.

It is asserted in the dissenting opinion that section 25 is violative of Article II of our Constitution and, therefore, invalid and void. The Article in question acknowledges and grants to the United States the right to exercise exclusive legislation ''as provided by the Constitution of the United States'' over certain military reservations existent at the time of the adoption of the Constitution ''to the same extent and with the same effect as if said reservations had been purchased by the United States by consent of the legislative assembly'' of the state. The Article authorizes and directs the legislative assembly to enact laws necessary or proper to give effect to the Article.

From the phraseology of the Article, it is apparent that the framers of the Constitution of this state were thoroughly familiar with the provisions of the federal Constitution, and doubtless with the opinion of the Attorney General of the United States rendered on June 15, 1868 (12 Op. Attys. Gen. 428), wherein it was held that a constitutional convention of the state was not the legislature of that state in the sense of the Constitution and statutes of the United States, and that such a constitutional provision was ineffective in itself as an Act of cession.

It is said in the dissenting opinion that the Article is a proper place for the application of the rule of ''*inclusio unius est exclusio alterius.*'' This rule is but one of interpretation and not a constitutional command. (*State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708, 186 Pac. 697; *Mills* v. *State Board of Equalization,* 97 Mont. 13, 33 Pac. (2d) 563; *State ex*

*rel. Normile* v. *Cooney,* 100 Mont. 391, 47 Pac. (2d) 637; *State* v. *Driscoll,* 101 Mont. 348, 54 Pac. (2d) 571.) This Article of the Constitution is not a limitation upon the legislative power, but is a solemn mandate to the legislature, directing it to pass the legislation necessary to carry the provisions of the Article into operation. The proposed construction is unsound.

It becomes important to determine as a preliminary question ▮▮ when these lands were purchased by the United States. Prior to the enactment of Chapter 50, supra, the United States had entered into agreements with their owners under which the government went into possession, although in some instances the compensation for the lands had not been paid. The construction of the town had been commenced. The owners of the land were subsequently paid for the taking thereof. In the case of *Hurley* v. *Kincaid,* 285 U. S. 95, 52 Sup. Ct. 267, 269, 76 L. Ed. 637, the Secretary of War and the Chief Engineers of the Mississippi River Flood Commission proposed, pursuant to Act of Congress (33 U. S. C. A., secs. 702a et seq.), to construct certain works which would result in the flooding of Kincaid's lands, thereby imposing on his lands an additional servitude. It was sought by the action to enjoin all proceedings leading to the construction of the proposed works until he had received compensation for the taking of his lands. The court, in disposing of the case, said: ''We have no occasion to determine any of the controverted issues of fact or any of the propositions of substantive law which have been argued. Kincaid concedes that the Act is valid, and that it authorizes those intrusted with its execution to take his lands or an easement therein. We may assume that, as charged, the mere adoption by Congress of a plan of flood control which involves an intentional, additional, occasional flooding of complainant's land constitutes a taking of it—as soon as the government begins to carry out the project authorized. (Compare *United States* v. *Lynah,* 188 U. S. 445, 469, 23 Sup. Ct. 349, 47 L. Ed. 539; *United States* v. *Cress,* 243 U. S. 316, 328, 37 Sup. Ct. 380, 61 L. Ed. 746; *Peabody* v. *United States,* 231 U. S. 530, 538, 34 Sup. Ct. 159, 58 L. Ed. 351; *Portsmouth Harbor Land & Hotel Co.* v. *United States,*

250 U. S. 1, 39 Sup. Ct. 399, 63 L. Ed. 809; Id., 260 U. S. 327, 329, 43 Sup. Ct. 135, 67 L. Ed. 287.) If that which has been done, or is contemplated, does constitute such a taking, the complainant can recover just compensation under the Tucker Act in an action at law as upon an implied contract, since the validity of the Act and the authority of the defendants are conceded. (*United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 658, 5 Sup. Ct. 306, 28 L. Ed. 846; *Great Falls Mfg. Co.* v. *Attorney General*, 124 U. S. 581, 600, 8 Sup. Ct. 631, 31 L. Ed. 527; *Tempel* v. *United States*, 248 U. S. 121, 129, 39 Sup. Ct. 56, 63 L. Ed. 162; *Marion & Rye Valley Ry. Co.* v. *United States*, 270 U. S. 280, 283, 46 Sup. Ct. 253, 70 L. Ed. 585.) The compensation which he may obtain in such a proceeding will be the same as that which he might have been awarded had the defendants instituted the condemnation proceedings which it is contended the statute requires. Nor is it material to inquire now whether the statute does so require. For even if the defendants are acting illegally, under the Act, in threatening to proceed without first acquiring flowage rights over the complainant's lands, the illegality, on complainant's own contention, is confined to the failure to compensate him for the taking, and affords no basis for an injunction if such compensation may be procured in an action at law. The Fifth Amendment does not entitle him to be paid in advance of the taking.''

The word ''purchase,'' as used in the clause of the Constitution, does not have the technical meaning of the term at common law of an acquisition of lands other than by descent or inheritance, but has the meaning of an acquisition thereof by an actual purchase. (*Crook, Horner & Co.* v. *Old Point Comfort Hotel Co.*, (C. C.) 54 Fed. 604.)

When the United States went into possession of these lands with the consent of the Secretary of War, under a contract with the owners who could then and thereafter maintain an action against it for the agreed price, the lands were purchased. The agreement for the purchase was made, and the officers and

agents of the federal government went into possession prior to the enactment of Chapter 50, supra.

In order for lands purchased by the United States within this state to be within the exclusive jurisdiction of the United States, they must be purchased with the consent of the state expressed by its legislature. In the case of *Fort Leavenworth Railroad Co.* v. *Lowe*, 114 U. S. 525, 5 Sup. Ct. 995, 998, 29 L. Ed. 264, it was written: ''The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals.'' Lands acquired by the United States in some manner other than by purchase with the consent of the state expressed by the state legislature and the buildings erected thereon for the use of the national government are free from any interference and jurisdiction of the state as would impair their effective use for the purpose for which the property was acquired. When in such case the state cedes jurisdiction to the United States, the state may impose conditions which are not inconsistent with the carrying out of the purposes of the acquisition. (*United States* v. *Unzeuta*, 281 U. S. 138, 50 Sup. Ct. 284, 74 L. Ed. 761; *Fort Leavenworth Railroad Co.* v. *Lowe*, supra; *Chicago, R. I. & P. Ry. Co.* v. *McGlinn*, 114 U. S. 542, 5 Sup. Ct. 1005, 29 L. Ed. 270; *Benson* v. *United States*, 146 U. S. 325, 13 Sup. Ct. 60, 36 L. Ed. 991; *Palmer* v. *Barrett*, 162 U. S. 399, 16 Sup. Ct. 837, 40 L. Ed. 1015; *Arlington Hotel Co.* v. *Fant*, 278 U. S. 439, 49 Sup. Ct. 227, 73 L. Ed. 447.)

Where lands are acquired otherwise than by purchase with consent of the state, a reservation of the taxing power by the state in the Act of cession, as against property of persons other

than the United States, is valid (*Fort Leavenworth Railroad Co.* v. *Lowe,* supra) ; but where lands are acquired by purchase with the consent of the state, conditions imposed in the Act of cession permitting the service of civil and criminal process of the state within the reservation relating to acts occurring without such a condition does not invade the exclusive jurisdiction of the United States, although other conditions may render invalid the consent of the state.

The Supreme Court of the United States, in the case of *Fort Leavenworth Railroad Co.* v. *Lowe,* supra, quoted with approval from the opinion of Mr. Justice Story, in *United States* v. *Cornell,* Fed. Cas. No. 14,867, 2 Mason, 60, the following: "In its terms, it certainly does not contain any reservation of concurrent jurisdiction or legislation. It provides only that civil and criminal process issued under the authority of the state, which must, of course, be for acts done within and cognizable by the state, may be executed within the ceded lands, notwithstanding the cession. Not a word is said from which we can infer that it was intended that the state should have a right to punish for acts done within the ceded lands. The whole apparent object is answered by considering the clause as meant to prevent these lands from becoming a sanctuary for fugitives from justice for acts done within the acknowledged jurisdiction of the state. Now, there is nothing incompatible with the exclusive sovereignty or jurisdiction of one state that it should permit another state in such cases to execute its process within its limits. And a cession of exclusive jurisdiction may well be made with a reservation of a right of this nature, which then operates only as a condition annexed to the cession, and as an agreement of the new sovereign to permit its free exercise, as *quoad hoc* his own process. This is the light in which clauses of this nature (which are very frequent in grants made by the states to the United States) have been received by this court on various occasions on which the subject has been heretofore brought before it for consideration, and it is the same light in which it has also been received by a very learned state court. In our judgment it comports

entirely with the apparent intention of the parties, and gives effect to acts which might otherwise, perhaps, be construed entirely nugatory. For it may well be doubted whether congress is, by the terms of the Constitution, at liberty to purchase lands for forts, dockyards, etc., with the consent of the state legislature, where such consent is so qualified that it will not justify the exclusive legislation of congress there. It may well be doubted if such consent be not utterly void.''

It is here contended that section 25 imposes a condition upon ▉▉ the consent of the state, in that the filing of a plat describing the lands acquired in the office of the county clerk and recorder of the county where located is required. The pleadings are silent as to whether such plat was filed. The clause of the section containing this requirement is introduced with the use of the word ''provided.'' If any condition or limitation is to be found in the section, it must be deduced from this word. In the case of *McDonald* v. *United States*, 279 U. S. 12, 49 Sup. Ct. 218, 219, 73 L. Ed. 582, it was said of the use of the word ''provided'' in the Acts of Congress, as follows: ''But a proviso is not always limited in its effect to the part of the enactment with which it is immediately associated; it may apply generally to all cases within the meaning of the language used. (*United States* v. *Babbit*, 1 Black, 55, 17 L. Ed. 94; *Springer* v. *Philippine Islands*, 277 U. S. 189, 207, 48 Sup. Ct. 480, 72 L. Ed. 845.) Little if any significance is to be given to the use of the word 'provided.' In Acts of Congress, that word is employed for many purposes. (*Schlemmer* v. *Buffalo, Rochester etc. Ry. Co.*, 205 U. S. 1, 10, 27 Sup. Ct. 407, 51 L. Ed. 681.) Sometimes it is used merely to safeguard against misinterpretation or to distinguish different paragraphs or sentences. (*Georgia R. & Banking Co.* v. *Smith*, 128 U. S. 174, 181, 9 Sup. Ct. 47, 32 L. Ed. 377.) For the proper construction of the provision in question, consideration need not be limited to the subdivision in which it is found; the general purpose of the section may be taken into account. (*United States* v. *Whitridge*, 197 U. S. 135, 143, 25 Sup. Ct. 406, 49 L. Ed. 696.)''

The word "provided," when used in a legislative enactment, may create a condition, limitation, or exception to the Act itself, or it may be used merely as a conjunction meaning "and" or "before," and as to what sense the word was used must be determined from the context of the Act.  (*Radil* v. *Morris & Co.*, 103 Neb. 84, 170 N. W. 363, 7 A. L. R. 539; *Georgia etc. Co.* v. *Smith*, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377; *Griffa* v. *City of Monmouth*, 95 Or. 433, 188 Pac. 163; *Considine* v. *Metropolitan Life Ins. Co.*, 165 Mass. 462, 43 N. E. 201; *State ex rel. Tadlock* v. *Mooneyham*, 212 Mo. App. 573, 253 S. W. 1098; *Smalley* v. *Ashland Brown-Stone Co.*, 114 Mich. 104, 72 N. W. 29.)

From an examination of the context of section 25, we conclude that the word "provided," as there used, was uttered as a conjunction, meaning "and."   The section was a general Act which might apply to any purchase of land made by the United States for the purposes mentioned in the federal Constitution.   That portion of the section relating to the filing of the plat was a legislative direction for the preservation of a record of a transaction as to which the consent of the Act had operated.

It is next contended by relator that the consent found in section 25 is limited to certain classes of buildings which is not sufficiently broad to include such buildings as are here involved. This argument is based largely upon the title of the Act (Laws 1893, pp. 51, 52) at the time of the original passage of section 25.   We concede the rule to be that, when necessary, recourse may be had to the title of an Act in order to determine the legislative intention (*Nangle* v. *Northern Pac. Ry. Co.*, 96 Mont. 512, 32 Pac. (2d) 11), but where the language of a statute is unambiguous, it does not require construction, it construes itself (*State ex rel. Du Fresne* v. *Leslie*, 100 Mont. 449, 50 Pac. (2d) 959, 101 A. L. R. 1329).

Section 25, so far as the scope of the consent it concerned, is clear.   It consents to the acquisition of lands by purchase, as provided by the clause of the federal Constitution.   If any uncertainty arises, it is from the language of the clause of the Constitution, and not the statute.   Furthermore, this section, as

we have elsewhere pointed out, has been carried forward in all of our revisions of our Codes which have been adopted by various sessions of the legislature. Any defect or omission in the title of an Act so carried forward into the Codes and approved by a subsequent legislature is thereby cured. (*Cashin* v. *Northern Pac. Ry. Co.*, 96 Mont. 92, 28 Pac. (2d) 862.) The Act itself being unambiguous in the respect under consideration, and it having been adopted into the Code, we may no longer resort to the title to determine the legislative intention. (*Cashin* v. *Northern Pac. Ry. Co.*, supra.)

Again it is urged that we may resort to certain administrative interpretations, which tend to indicate that both the federal and state governments had construed the Act as indicative of the fact that both were operating under Chapter 50, supra. We refer to the correspondence between the Acting Secretary of War and the Acting Governor of Montana. In the case of *State ex rel. Nagle* v. *Stafford*, 97 Mont. 275, 34 Pac. (2d) 372, 378, we said: " 'A course of practice founded upon a mistaken construction of a statute cannot have the force of law, no matter how long it has continued, unless there be a reasonable doubt as to the meaning of the particular provision upon which the practice is founded. Contemporaneous construction cannot abrogate a plain provision of law, or fritter away its obvious sense.' (*State ex rel. Robinson* v. *Clements*, 37 Mont. 100, 95 Pac. 845, 846 [127 Am. St. Rep. 705].) The specific provisions of the law furnish the guide, and not usage and custom. (*State ex rel. Broadwater Farms Co.* v. *Broadwater Elevator Co.*, 61 Mont. 215, 201 Pac. 687.) This court, in the case of *State ex rel. Haire* v. *Rice*, 33 Mont. 365, 83 Pac. 874, 877, when speaking with reference to the contemporaneous construction given to a constitutional provision by the other co-ordinate departments of the state government, said: 'Such construction can never abrogate the text or fritter away its obvious sense. And acquiescence for no length of time in a construction by the co-ordinate branches of government which has the effect of nullifying a provision of the Constitution will justify a court in adopting such

construction unless it is the only reasonable one.' '' We recently approved this statement in *State ex rel. Matson* v. *O'Hern,* 104 Mont. 126, 65 Pac. (2d) 619.

This court quoted with approval from the opinion in the case of *United States* v. *Cornell,* supra, in the case of *State* v. *Tully,* 31 Mont. 365, 78 Pac. 760, 762, 3 Ann. Cas. 824, as follows: ▮▮ '' 'The Constitution of the United States declares that Congress shall have power to exercise "exclusive legislation" in all "cases whatsoever" over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings. When, therefore, a purchase of land for any of these purposes is made by the national government, and the state legislature has given its consent to the purchase, the land so purchased, by the very terms of the Constitution, ipso facto falls within the exclusive legislation of Congress, and the state jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation.' ''

It is clear thus far that the lands in question were purchased ▮▮ by the United States with the consent of the state expressed by its legislature, but if they are within the clause of the federal Constitution, it must be by reason of the fact that they were taken for the erection of "other needful buildings." It is argued that a dam, such as the one under consideration is not a building within the clause of the federal Constitution. In support of this contention, our attention is invited to the case of *Nikis* v. *Commonwealth of Virginia,* 144 Va. 618, 131 S. E. 236, 46 A. L. R. 219, wherein it was held that an approach to a bridge located on lands purchased by the United States with the consent of the state, did not come within the clause of the Constitution, and in particular within the designation of "other needful buildings." If we assume that the dam is not such a building, nevertheless the townsite contains many buildings, the property of the United States. No one denies that these structures are buildings. Many of them house the administrative officers

or those in charge of the construction of the dam; others are the places of residence of those employed in various capacities in connection with its construction; and yet others are the places of business of trades people engaged in supplying those employed in and about the construction of the dam with the necessities and comforts of life. None may reside on the reservation without the consent of the federal government, nor may any engage in business without this consent, and then only subject to its entire and complete regulation of their business and conduct. Many millions of dollars have been expended by the federal government in the construction of the dam, and it is contemplated that many more millions will be expended before it is finally completed. Since the facilities of the housing of those engaged in and about the construction of the project were not available at a convenient distance from the dam, it follows that the buildings on the townsite were, and now are, needful buildings for the completion of this project and, therefore, are within the clause of the federal Constitution.

But it is said that much of the area over which the United States is assuming to exercise exclusive jurisdiction is not a part of the townsite and is not occupied by these buildings. In the case of *Benson* v. *United States,* 146 U. S. 325, 13 Sup. Ct. 60, 62, 36 L. Ed. 991, the defendant was convicted of the crime of murder committed on the Fort Leavenworth Military Reservation. The Act of cession gave the United States jurisdiction over this reservation. The court there said: "It is contended by appellant's counsel that, within the scope of those decisions, jurisdiction passed to the general government only over such portions of the reserve as are actually used for military purposes, and that the particular part of the reserve on which the crime charged was committed was used solely for farming purposes. But in matters of that kind the courts follow the action of the political department of the government. The entire tract had been legally reserved for military purposes. (*United States* v. *Stone,* 2 Wall. 525, 537 [17 L. Ed. 765].) The character and purposes of its occupation having been offi-

cially and legally established by that branch of the government which has control over such matters, it is not open to the courts, on the question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put. There was therefore jurisdiction in the circuit court, and the first contention of plaintiff in error must be overruled.''

The power of taxation of necessity must be limited to subjects ▮▮▮ within the jurisdiction of the state. (*Ford Motor Co. v. Linnane,* 102 Mont. 325, 57 Pac. (2d) 803; *Hayes v. Smith,* 58 Mont. 306, 192 Pac. 615.)  In the case of *Surplus Trading Co. v. Cook,* 281 U. S. 647, 50 Sup. Ct. 455, 457, 74 L. Ed. 1091, the trading company had purchased certain woolen blankets at an advertised sale from the United States, the greater part of which were in storage at Camp Pike within the exterior boundaries of Pulaski county, Arkansas. Camp Pike was an army mobilization, training and supply station of the United States, the lands in which had been purchased by the United States with the consent of the legislature of the state. The county taxing authorities sought to impose a tax upon these blankets while stored at Camp Pike. The Supreme Court of Arkansas upheld the tax. (*Haynie v. Surplus Trading Co.,* 174 Ark. 507, 297 S. W. 822.) In the consideration of the case before the Supreme Court of the United States, it was said: ''The question is not an open one. It long has been settled that, where lands for such a purpose are purchased by the United States with the consent of the state legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction.'' After an exhaustive review of many authorities supporting the foregoing quotation, the court then said: ''For the reasons which have been stated, we are of opinion that the supreme court of the state erred in holding that her tax laws could be applied to personal property within Camp Pike consistently with section 8, clause 17, of Article I of the Constitution, and therefore that the judgment of that court must be reversed.''

In the case of *Standard Oil Co.* v. *California*, 291 U. S. 242, 54 Sup. Ct. 381, 382, 78 L. Ed. 775, the state "undertook to lay a license tax upon every distributor for each gallon of motor vehicle fuel 'sold and delivered' " in the state at the rate of 3 cents per gallon. The oil company delivered 420 gallons of gasoline to the post exchange within the Presidio of San Francisco. The Presidio is a tract of more than 1,400 acres lying within the exterior limits of California. It was set apart by Executive Order and used as a military reserve by the United States government. California ceded the exclusive jurisdiction to the United States over the area without reservation as to the right to tax. It will be noted that these lands were not acquired by purchase, but were set apart by Executive Order from the public domain. Suit was brought by the state to collect a tax on the sale of this gasoline. The tax was upheld by the California courts. The Supreme Court of the United States said: "In three recent cases—*Arlington Hotel Co.* v. *Fant*, 278 U. S. 439, 49 Sup. Ct. 227, 73 L. Ed. 447, *United States* v. *Unzeuta*, 281 U. S. 138, 50 Sup. Ct. 284, 74 L. Ed. 761, and *Surplus Trading Co.* v. *Cook*, 281 U. S. 647, 50 Sup. Ct. 455, 74 L. Ed. 1091—we have pointed out the consequences of cession by a state to the United States of jurisdiction over lands held by the latter for military purposes. Considering these opinions, it seems plain that by the Act of 1897 California surrendered every possible claim of right to exercise legislative authority within the Presidio—put that area beyond the field of operation of her laws. Accordingly, her legislature could not lay a tax upon transactions begun and concluded therein," The Washington court arrived at a like conclusion with reference to an attempt to tax the personal property of a concessionaire on the military reservation at Camp Lewis, where the state had ceded exclusive jurisdiction to the United States. (*Concessions Co.* v. *Morris*, 109 Wash. 46, 186 Pac. 655.)

We conclude that the county taxing officers are without right or authority to tax any of the property within the area of any county over which the United States has assumed exclusive

jurisdiction as described in the plat accompanying the letter of the Acting Secretary of War, Woodring, and in all cases where the land was purchased by the United States prior to the passage and approval of section 25.1. On the land, within the purview of Chapter 50, supra, which was acquired subsequent to its passage and approval, and all lands which were part of the public domain, all property located thereon of persons other than the United States, is subject to taxation. Over all lands acquired by the United States subsequent to the approval of Chapter 50, and all lands which were part of the public domain, the United States may exercise jurisdiction, but subject to all of the reservations, restrictions, and limitations of Chapter 50.

Since this proceeding related only to property within the area over which the United States has assumed exclusive jurisdiction consisting of land acquired by purchase prior to the enactment of Chapter 50, supra, this action is ordered dismissed.

ASSOCIATE JUSTICES STEWART and MORRIS concur.

MR. JUSTICE ANGSTMAN, Dissenting:

I agree with what is said in the foregoing opinion to the effect that section 24, Revised Codes, does not control this case. I cannot agree, however, that section 25 controls. In my opinion, section 25.1 is the controlling statute.

There is no showing here that section 25 was complied with by filing the map or plat therein provided for. On the other hand, it is shown that section 25.1 was complied with by notifying the Governor of Montana of the assumption of police and military jurisdiction over the area involved. These facts tend to show that so far as the federal government is concerned, its intention was to be governed by section 25.1, and certainly that was the intention of the state.

In the case of *Fort Leavenworth Railroad Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. 995, 1002, 29 L. Ed. 264, the court, in discussing the provision of the United States Constitution, clause 17 of section 8, Article I, quoted with approval from the case of *People* v. *Godfrey,* 17 Johns. (N. Y.) 225, as follows: "The es-

sence of that provision is that the state shall freely cede the particular place to the United States for one of the specific and enumerated objects. This jurisdiction cannot be acquired tortiously or by disseizin of the state; much less can it be acquired by mere occupancy, with the implied or tacit consent of the state, when such occupancy is for the purpose of protection."

The only actual consent given by the state to the purchase by the United States of lands in the Fort Peck area is that found in section 25.1. I think the latter section would have to be construed, not as a consent within the meaning of clause 17, section 8, Article I of the Constitution, but rather as a cession to the United States of jurisdiction, subject to the restrictions therein contained, one of which is the right of the state to tax personal property in private ownership situated on the land. It should be remembered here that the federal government is not involved in this proceeding. It is not contending that the imposition of this tax will in any manner hinder, defeat, or impede its activities. The question is raised here by those owning personal property situated on the area.

I think on the record before us we must say that section 25.1 is the controlling statute, and, that being so, the personal property in private ownership is taxable by the state.

On another ground I think section 25 cannot apply. Article II of the Montana Constitution provides: "Authority is hereby granted to and acknowledged in the United States to exercise exclusive legislation, as provided by the Constitution of the United States, over the military reservations of Fort Assinaboine, Fort Custer, Fort Keogh, Fort Maginnis, Fort Missoula, and Fort Shaw, as now established by law, so long as said places remain military reservations, to the same extent and with the same effect as if said reservations had been purchased by the United States by consent of the legislative assembly of the state of Montana; and the legislative assembly is authorized and directed to enact any law necessary or proper to give effect to this Article. Provided, that there be and is hereby reserved to the state the right to serve all legal process of the state, both civil

and criminal, upon persons and property found within any of said reservations, in all cases where the United States has not exclusive jurisdiction."

The rule is well settled that "under the maxim, *expressio unius est exclusio alterius,* the enumeration of certain specified things in a constitutional provision will usually be construed to exclude all things not thus enumerated." (12 C. J. 707.) Cases supporting this rule are the following: *State* v. *Tucson Gas, Elec. L. & P. Co.,* 15 Ariz. 294, 138 Pac. 781; *People ex rel. McCullough* v. *Deutsche etc. Confession,* 249 Ill. 132, 94 N. E. 162; *State ex rel. West* v. *Butler,* 70 Fla. 102, 69 So. 771; *Gougar* v. *Timberlake,* 148 Ind. 38, 46 N. E. 339, 62 Am. St. Rep. 487, 37 L. R. A. 644; *In re Atchison, T. & S. F. Ry. Co.,* 37 N. M. 194, 20 Pac. (2d) 918; *Collingsworth County* v. *Allred,* 120 Tex. 473, 40 S. W. (2d) 13; *Ex parte Arascada,* 44 Nev. 30, 189 Pac. 619; *Findlay* v. *State,* 113 Tex. 30, 250 S. W. 651; *American Indemnity Co.* v. *City of Austin,* 112 Tex. 239, 246 S. W. 1019.

In *Lake* v. *Lake,* 17 Nev. 230, 30 Pac. 878, 880, the court said: "It is settled that affirmative words in a constitution, that courts shall have the jurisdiction stated, naturally include a negative that they shall have no other."

There is nothing in the case of *State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708, 186 Pac. 697, to militate against this view, since there the rule was attempted to be invoked to thwart an express provision of the Constitution. This case is controlled by the principle announced in *Re Weston,* 28 Mont. 207, 72 Pac. 512.

Article II of our Constitution expressly authorizes the legislature to enact necessary laws to give exclusive legislation to Congress over the areas therein described, and under the familiar rule of statutory and constitutional construction, "*expressio unius est exclusio alterius,*" the enumeration of those areas excludes others and impliedly prohibits the legislature from giving exclusive legislation to the United States over other areas not enumerated. If section 25 attempts to do so, it is beyond

the power of the legislature as impliedly restricted by Article II, supra. Section 25.1 merely cedes concurrent jurisdiction in the United States, and our Constitution does not prohibit the ceding of concurrent jurisdiction.

Mr. Chief Justice Sands:

I concur with Mr. Justice Angstman and dissent from the majority opinion.

The facts are very fully set out in the majority opinion; therefore I shall not attempt to cover the details of the situation, with this exception: There are several statements, particularly as to ownership, which are statements of conclusions reached by the writer of the majority opinion instead of statements of facts; with relation to these statements comment is made later.

The suit is brought by the county commissioners of Valley county against the assessor and treasurer of that county. Certain merchants in Fort Peck have intervened and are the real parties defendant. The United States is not a party and is not in any way participating in this suit. The chief point in controversy is the question of what statutes, that is the statutes of what date, apply to the alleged jurisdiction of the United States. The national Constitution (Article I, sec. 8, clause 17) provides: "The congress shall have power— * * * To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of government of the United States; and to exercise like authority over all places *purchased by* the *consent* of the *legislature* of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and *other needful buildings*"; etc. The state Constitution in Article II provides: "Authority is hereby granted to and acknowledged in the United States to exercise exclusive legislation, as provided by the Constitution of the United States, over the military reservations of Fort Assinaboine, Fort Custer, Fort Keogh, Fort Maginnis, Fort Missoula, and Fort Shaw, as now established by law,

so long as said places remain military reservations, *to the same extent* and with the same effect as if said reservations had been purchased by the United States by consent of the legislative assembly of the state of Montana; and the legislative assembly is authorized and directed to enact any law necessary or proper to give effect to this article. Provided, that there be and is hereby reserved to the state the right to serve all legal process of the state, both civil and criminal, upon persons and property found within any of said reservations, in all cases where the United States has not exclusive jurisdiction."

The state of Montana, and in particular the section of the state in which Fort Peck townsite is situated, was acquired by the Louisiana purchase. The state acquired its jurisdiction when the Constitution was written under the provisions of the Enabling Act and accepted by the people of the state when it was organized in 1889. The state legislature enacted two provisions respecting the jurisdiction of the United States and the state: sections 24 and 25, enacted in 1893, and 1895, which authorize the United States to assume exclusive jurisdiction over such lands as the government might purchase for the purposes specified in the state and national Constitution. It must be observed that both Constitutions limit the right of the exclusive jurisdiction of the United States to lands "purchased," and this limitation is emphasized in several decisions of the Supreme Court of the United States. (See *Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. 995, 1002, 29 L. Ed. 264.) "This jurisdiction cannot be acquired tortiously or by disseizin of the state; much less can it be acquired by *mere occupancy,* with the implied or tacit consent of the state, when such occupancy is for the purpose of protection." (The italicizing of the words *"mere occupancy"* is by the writer.) It is practically conceded by all parties to this action that the right to exclusive jurisdiction is strictly limited to lands *purchased* by the United States.

As said before, the laws passed in 1893 and 1895 provided a general method by which the jurisdiction of the state was passed

over to the United States, and both of those provisions required that ''an accurate map or plat and description by metes and bounds of said land shall be filed in the office of the county clerk * * * of the county in which the same are situated,'' before the United States could assume exclusive jurisdiction.

On January 17, 1933, the legislature passed a special Act (Laws 1933–34, Sp. Sess., Chap. 50, now section 25.1, Rev. Codes), applying exclusively to the Fort Peck project. It provided that exclusive jurisdiction of the United States should vest as to lands purchased by the United States when that exclusive jurisdiction was demanded and a map filed with the Governor. The particular provisions of that law applicable here read as follows: ''That consent to purchase or condemn all necessary lands is hereby given and concurrent jurisdiction shall be, and the same is hereby, ceded to the United States over the Fort Peck dam, the body of water or artificial lake created by such dam, the land under such body of water, and any lands now owned or which may be hereafter acquired by the United States and which shall touch such body of water, all such being situated in the counties of Valley, Phillips, McCone, Garfield, Petroleum and Fergus, State of Montana, saving, however, to the said state the right to serve civil or criminal process within the limits of the territory over which jurisdiction is so ceded in any suits or prosecutions for or on account of rights obtained, obligations incurred, or crimes committed in said state, within or without said territory, and saving further to the said state *the right to tax persons and corporations, their franchises and property within said territory,* and reserving further to the said state and its inhabitants, citizens, and nonresidents the right to fish or hunt by boat or otherwise, and the right of access, ingress and egress to and through said ceded territory to all persons owning or controlling livestock for the purpose of watering the same, and saving further to the state jurisdiction in the enforcement of the state laws relating to the duties of the livestock sanitary board, and the state board of health, and the enforcement of regulations promulgated by said boards in accordance

with the laws of said state; *provided, however, that jurisdiction shall not vest until the United States, through the proper officers, notifies the governor of the state of Montana that they assume police or military jurisdiction over said territory."*

It will be noted that the above language specifically provides that before the United States shall assume exclusive jurisdiction, it was required to file with the *Governor* a statement of the lands *purchased*, with description thereof, and a statement that the United States was thereby demanding exclusive jurisdiction. Particular attention is called to the two methods of advising the state of the purpose of the United States to assume jurisdiction. In the older laws, notice was to be filed with the county clerk. In the later special law, the notice was to be filed with the Governor.

The controversy here depends almost entirely upon which one of the three laws governs. The older laws do not make any exceptions to the exclusive jurisdiction. The later special law, effective January 17, 1934, reserves the right to the state to tax personal property. It is plain that no tax could be levied on any property belonging to the United States within this territory, and no claim is made by the state that it can do so. Buildings, if any, placed on this Fort Peck land by private individuals are not in issue in this case. Certain merchants on the Fort Peck townsite appearing as interveners are the real parties defendant in this suit. As said before, the federal government is not appearing in any manner or taking any part.

It is alleged that work was commenced on the dam and certain roads and streets were laid out in the Fort Peck townsite in the late fall of 1933. The land was owned by Chester Taylor and others in severalty. There is no definite statement of the extent or character of the possession taken by the government. The interveners allege that the land embraced within what is now the townsite of Fort Peck was occupied by the government prior to January 1, 1934, which would be prior to the passage of the special Fort Peck Act; but resort is necessary to an unofficial map to point out the townsite. The interveners allege

that on November 11, 1933, "Taylor, the owner of the land embraced in tract 1 * * * gave the United States an *option to purchase* the land." That on November 29, 1933, the district engineer, United States Engineer Department, requested authority from the chief engineer to buy the land from Mr. and Mrs. Taylor, and to take immediate possession thereof. That on December 26, 1933, the acting chief of engineers of the United States Engineer Department requested authority of the Secretary of War of the United States to buy the land, take immediate possession, and proceed with the construction work of the town of Fort Peck thereon, and such authority was granted by the Secretary of War on December 28, 1933. Under the option, but before the approval by the Secretary of War, and on or about December 1, 1933, interveners allege the United States took *exclusive possession* of the land in the Fort Peck townsite, and ever since has been in such exclusive possession, and has been and is the sole owner thereof. It is further alleged by interveners that "owing to the need for clearing title the deeds of conveyance from Mr. and Mrs. Taylor to the United States were not delivered until April 11, 1934." The conveyances of the other owners were made later, the last on January 5, 1935, "sometime after the establishment of the town."

Let it be noted that the possession was under the *option* and that the earliest deed was April 11, 1934, over a month after the special Fort Peck Act went into effect. The interveners and the defendants claim that the possession taken by the government prior to January 1, 1934, then constituted the government a purchaser, and therefore then qualified it to assume exclusive possession. I think there can be no controversy over the statement that an option must be accepted by the proposed purchaser and *such acceptance communicated to the owner* of the land before the acceptance of the option is complete, and that the sole offer is not beyond the power of the owner to withdraw unless some consideration has passed or the time limit in the option prevents. There is no allegation or evidence or statement in the record as to when this option was to expire or the terms thereof, or when it was actually accepted by the government,

and particularly when such acceptance was communicated to the owners. The Taylor deed was dated April 11, 1934, long after the special Act went into effect. It further appears that a portion of the land in the townsite was owned by a school district and only a reversionary interest was to be purchased.

The government, through the War Department, did not express its desire to assume exclusive jurisdiction to any officer of the county or state until its communication to the Governor of the state on October 10, 1934, many months after the special Act became effective. The communication is as follows:

"I take pleasure in transmitting for your information a map showing in colors the land acquired, *and being acquired,* for the execution of the project authorized by the Public Works Administration for the construction of the Fort Peck dam. These lands include the site of the dam, construction town, tunnels and spillway. The lands, as shown in the map in color, are now *either owned by the United States or are in course of acquisition. Those* in course of acquisition are *in possession* of the *United States under the terms of agreement with owners or under order of the Court in condemnation.*

"The nature, character and extent of the work at the locality is such that the United States must now assume police jurisdiction over the lands hereinbefore described. It is my duty therefore, to issue instructions to the federal officials in charge of the work that they shall assume complete and exclusive jurisdiction over these lands. I shall appreciate your cooperation in so advising the officials of your state." (Signed by Harry H. Woodring, Acting Secretary of War.)

"(Note.) This map was filed in the office of the Secretary of State of Montana, and copies of the letter from the War Department were sent to officials of the counties interested."

This is the only official communication from the government to the state with relation to the above matter.

The map filed with the letter shows three classes of lands, the one in red comprising about 22,680 acres, the area over which exclusive jurisdiction was assumed by the letter dated October 10, 1934, from the Assistant Secretary of War to the Governor.

Apparently the lands shown on the map in yellow, covering several thousand acres over a territory a hundred miles long, were not claimed for exclusive jurisdiction by the government, as evidenced by the letter and map of October 10, 1934. This letter states that these lands include "the site of the dam, construction town, tunnels and spillway" and that only part of them has been acquired, but it states that the lands *not acquired are in the possession of the government,* and proceedings "*are pending for purchase.*" The titled lands are not specifically described, so that it is impossible from the letter or map to tell exactly what lands have been purchased and, therefore, what lands could lawfully at such time be placed under the exclusive jurisdiction of the United States. However, by the letter, the Fort Peck townsite is not definitely described, and the lands marked in red are important in this case as demonstrating the indefinite character of the description of the area, and also very important in this case to show the first date when jurisdiction of any land was claimed by the United States. The letter further states that the "*United States must now assume police jurisdiction over the lands hereinbefore described.*" That statement would imply that previous jurisdiction was not claimed; indeed, the failure of the government to file any other map or statement claiming any character of jurisdiction prior to that time would necessarily imply that no previous exclusive jurisdiction was claimed. The letter addressed to the Governor, instead of filing the description with the county clerk, would further carry the very significant implication that the government did not claim exclusive jurisdiction over any other lands in the state for this purpose, and that the claim then made was under the special, and not under the general, Act.

In reply to the above letter the Acting Governor of the state expressed his understanding to the same effect in very definite language, as follows:

"October 15, 1934.

"This is to acknowledge receipt of your letter of October 10 (E. D. 6500-Fort Peck Res.-362) giving notice that the Federal

Government assumes complete and exclusive jurisdiction over lands acquired and being acquired for the construction of the Fort Peck Dam. This is in accordance with the provisions of Chapter 50, Laws of the Extraordinary Session of 1933–34. I thank you for the information conveyed, and shall file the map inclosed with the proper state authority, and advise the officials of the state of the action taken by the Federal Government." (Signed by R. Pauline, Acting Governor.)

It will be observed that the Governor construed the letter from the government as complying with the *special Act*, and not in any way a compliance with the general Act. Therefore it would appear that both the government and the state assumed that all parties were acting under the special Act. If the government were a party to this action and claiming otherwise, the many citations of the United States Supreme Court decisions appearing in the majority opinion might be appropriate. The parties to this contract, if it may properly be called a contract, are the only proper parties to define the extent of the jurisdiction of the United States.

Another situation of grave and practical importance presents itself. The Constitutions of both the United States and the state authorize the government to assume exclusive jurisdiction only of lands *purchased*. The majority opinion asserts that taking possession of lands amounted to a purchase, and it cites several United States Supreme Court cases which, in the abstract, appear to support this proposition. But the fact is, as will appear upon reading the full text of these decisions, that they were suits for the recovery of the purchase price of the lands in question, and the decisions have no reference to the time when the right of the federal government to assume exclusive jurisdiction accrued. The language of both Constitutions is so plain and unambiguous that no authorities are required to construe it. "Purchase" means more than mere possession. Referring again to the letter from the government dated October 10, 1934, we note the description of the lands actually theretofore purchased is not shown either in the letter or in the map. It merely says that the lands are *either pur-*

*chased or are in course of acquisition.* Since the lands not yet purchased, that is, the lands in course of acquisition, are not definitely defined, neither are the lands which have been purchased defined. It is plain that the purpose of the law is that, before exclusive jurisdiction is taken, the lands must be definitely described. Indeed, if the state is to divest itself of its jurisdiction, that is to say, if this large area of land indicated in red on the map embracing about 22,680 acres is to be eliminated from the state, it becomes vastly important to have an accurate description. Further than this, it is almost necessary that the divested lands should be in a reasonably compact body. If the government is to assume exclusive jurisdiction over scattered subdivisions marked only by survey lines on paper, the jurisdiction of the state and the federal government, respectively, will be in frequent conflict for uncertainty. If the land is checker-boarded, one jurisdiction here and another across a 40-acre subdivision line, an assessor will have to take with him a surveyor whenever he attempts to assess the property in that territory. The government will have equal difficulty in determining the extent of its supervision over the checker-boarded territory.

On the other hand, if the assumption of the exclusive jurisdiction be delayed until all the land desired can be purchased and exclusive jurisdiction then assumed over a compact area, it will be far more practical than to accept the fragmentary area that may isolate tracts as small as 40 acres. At all events, the entire area shown in red on the map, much of it admittedly not purchased at the time the letter was written, could not be claimed as all subject to the exclusive jurisdiction by the federal government. If a part only, what is the part?

As stated before, the Constitutions authorize exclusive jurisdiction of forts, arsenals, and other needful buildings. Some courts have construed this language to include stocks of merchandise and other personal property, basing their conclusions solely on the words "other needful buildings." This construction goes beyond my limit and I cannot lend my approval

thereto, even though it be contrary to the decisions of several very prominent United States Supreme Court judges. While my objection is not in any way vital to the decision of the case, I take this occasion to voice my objection to such a perverted construction.

In conclusion, let me again say that so long as the lands in the Fort Peck townsite had not been purchased at the time the special Act of January 17, 1934, became effective, the Constitution did not authorize the granting by this state of exclusive jurisdiction to, or the assumption of such jurisdiction by, the United States of the area in question—the Fort Peck townsite —and therefore the assessor had the right to assess the personal property on the Fort Peck townsite.

Rehearing denied June 22, 1937, MR. CHIEF JUSTICE SANDS and MR. JUSTICE ANGSTMAN dissenting.

Appeal taken to Supreme Court of the United States September 17, 1937.